[No. 11740.  Department Two.  May 12, 1914.]

DOMINGOS JASINTO *et al.*, *Appellants*, v. LAWRENCE R.
HAMBLEN, *Executor etc.*, *et al.*, *Respondents*.
*In the Matter of the Estate of* JOHN ENOS.[1]

WILLS—CONTEST—TESTAMENTARY CAPACITY — UNDUE INFLUENCE—
EVIDENCE—SUFFICIENCY.  The evidence in a will contest sufficiently
shows mental capacity, and no undue influence on the part of the
testator's wife, to whom the bulk of the estate was left, to the prac-
tical exclusion of the testator's brothers and sisters, where it ap-
pears that the testator, who was married late in life and had an
apparently good reason for excluding his aged brothers and sisters,
made the will in question in 1911, on the solicitation of his wife,
there being some evidence that he was addicted to the use of in-
toxicants, it appearing however that he was mentally capable of
transacting any important business, that the making of a will was
first suggested by his attorney and confidential adviser, who drafted
it from his dictation alone, and was under careful consideration by
him for nearly a year when his mind was as clear as it had ever
been; it being the privilege of a wife to solicit the making of a
will.

WILLS—CONTESTS—COSTS.  Under Rem. & Bal. Code, § 1313, pro-
viding that the fees and expenses in will contests shall be paid by
the losing party, and that, if the probate be revoked, the party resist-
ing such revocation shall pay the costs out of the property of the
deceased, costs and attorney's fees cannot be allowed to the contest-
ants out of the estate, in an unsuccessful contest of a will.

Appeal from a judgment of the superior court for Spokane
county, Kennan, J., entered April 22, 1913, dismissing a will
contest, after a trial on the merits to the court.  Affirmed.

*Robertson & Miller* and *Graves, Kizer & Graves*, for appel-
lants.

*W. S. Gilbert*, for respondents.

MOUNT, J.—This is a proceeding to contest the will of one
John Enos, commonly known as "Portuguese Joe," who died
in the Azores islands on May 30, 1911.  He left an estate in
Spokane county of the value of about $200,000.  The will

[1]Reported in 140 Pac. 677.

is dated February 8, 1911. By the terms of the will, John
Enos bequeathed to his two brothers $5 each; to his two sis-
ters, $500 each; to a Catholic church in the Azores islands,
$10,000; to an asylum for the homeless in the Azores islands,
$10,000; to the Young Men's Christian Association of Spo-
kane, $5,000; and the remainder of the estate was devised
and bequeathed to the testator's wife, Mary Enos.

After the will was admitted to probate, the brothers and
sisters of the testator instituted this proceeding. For cause
of contest, they alleged, in substance, that, at the time of
the execution of the will, Mr. Enos was 73 years of age, ill
and in failing health, weak in mind and body, and mentally
incapable of making a will; that his wife, Mary Enos, pro-
cured the will to be made by the exercise of undue influence,
ill treatment, and by plying him with liquor; that the will
was not the free and voluntary act of the testator, but was
procured by fraud, duress and artifice, operating upon a
body and mind weakened by age, failing health, and the use
of alcohol.

Issues were joined, and the judge to whom such issues were
submitted for decision, called a jury to pass upon the facts.
In answer to interrogatories submitted by the trial judge,
the jury found that Enos died of alcoholism; that, at the
time of the execution of the will, Enos' mind was weakened
by age and the use of intoxicating liquors so as to be more
susceptible to undue influence; and that the residuary devise
to Mary Enos was procured by undue influence. The trial
judge disregarded the findings of the jury and entered a
judgment dismissing the contest, denying, at the same time,
the contestants' application for an allowance for costs and
counsel fees. From that judgment, the contestants have ap-
pealed.

It appears from the record in the case that John Enos
was born in the Azores islands of Portuguese parents. When
a young man, he came to the United States and settled in
Lincoln county, in this state, and engaged in the business of

raising cattle. After many years in this business, he sold his cattle ranch and cattle and invested in property in the city of Spokane, where he thereafter lived and looked after his property. In about the year 1908, having accumulated property which was then worth considerable money, he visited his brothers and sisters, who were then living in the Azores islands. These brothers and sisters were at that time very old. They were not possessed of fortunes, though they were not destitute. At that time, his relatives consisted of two brothers and two sisters. One of the sisters was unmarried. At that time, he purchased a home for his sisters, and employed a servant girl to care for them. He took title to this home in his own name and placed the servant girl in charge, with instructions to care for his sisters. He thereupon returned to the United States. After about a year, he returned to the Azores islands, accompanied by a brother who was in this country. He paid the expenses of his brother from this country to the islands, but did not pay his return expenses. When he arrived there, he found that his sisters had left the home which he had provided in charge of the servant girl. After remaining there for a while, he returned to the United States, bringing the servant girl with him. This servant girl, it appears, had never been married, but had two illegitimate children. After arriving in Boston, and on November 10, 1909, Joe and the servant girl were married. They came to Spokane and lived together thereafter until his death.

The testimony of the contestants tends to show that, after the marriage, and while the deceased and his wife were living in Spokane, Joe became addicted to the frequent use of alcoholic drinks; that his wife encouraged him in this and made statements to her friends that she married Joe for his money. The evidence also tends to show that she importuned him upon all occasions to make a will in her favor. Finally, on February 8, 1911, the deceased executed his will, devising and bequeathing the greater portion of the estate to his wife. She also at the same time made a will in which she willed all

her estate to her husband.   Shortly after making the wills, Joe and his wife returned to the Azores islands.   While there, he died.

The contestants in their brief say:

"The contestants' case, as we have heretofore pointed out, is not rested upon any supposed testamentary incapacity of Joe Enos.   It is not claimed that he was mentally incapable of transacting business of importance.   What is insisted upon is that during the last months of his life his judgment was so impaired, and his will-power so weakened by age and the excessive use of liquor, as to be incapable of resisting the constant pressure of the stronger will and mind of Mary Enos to make a will which should leave everything to her and disinherit his brothers and sisters.   This pressure, we insist, is proven to have been brought to bear upon him and to have accomplished the purpose for which it was designed.   If this is so, that part of the will which, after the payment of the inconsiderable bequests provided for, gave everything to her and left nothing to his brothers and sisters, was the product of undue influence."

While there was evidence introduced on behalf of the contestants, as we have stated, which tended to show that the testator consumed considerable intoxicating liquor after his marriage, and upon two or three occasions was intoxicated, we are satisfied, from a careful reading of all the evidence, that it does not show that the mind of Enos at the time the will was made was incapable of making an intelligent will, or that his mind was so weakened by the use of alcoholic liquors that the constant pressure of Mary Enos upon him to make a will in her favor resulted in a will other than he would otherwise have made.   If the evidence offered by the contestants upon this point was sufficient to show that his mind was not normal when the will was made, we think it was entirely overcome by evidence offered in support of the will, by substantial citizens, who had known him for many years in all his conditions of life, and who testified that his mind at the time and after making the will, was as clear as it ever

had been; that he was always a shrewd and well balanced man; that they were not aware of the fact of his use of intoxicating liquors at that time; and that they saw him almost daily, transacted business with him, and would have known if he had been under the influence of liquor, as the contestants would have us believe. It is true that there was some evidence which tended to show that he died of alcoholism, but this was entirely expert, conjectural evidence; and even this evidence tended as well to show that he might have died from some other cause. In other words, it was not conclusively shown, by any means, that alcoholism was the cause of his death.

It is true there is substantial evidence on the part of the contestants which tended to show that his wife, continuously, after the marriage, requested him to make a will in her favor leaving her everything, and that he did not accede to these requests, but stated to her that he was going to provide for his brothers and sisters. On the other hand, the evidence on the part of the proponents of the will shows almost conclusively that he had considered the making of a will for about a year before it was finally made. It shows that Joe was unable to read or write in his native tongue; he was likewise unable to read or write the English language; and until a few months before his death he was unable even to write his own name. In his more important business transactions, he relied upon trusted friends. He left his money with his banker. He consulted his banker almost daily about his business transactions. His banker drew checks for him, and had absolute control of his funds. He likewise made a confidential adviser of his attorney and counselor, Mr. Hamblen, and from 1903 until the time of his death, was constantly advising, frequently daily, upon matters of business, with Mr. Hamblen.

It was Mr. Hamblen who, after Joe's marriage in 1909, without solicitation from any person, suggested to Joe that, now he was married, he should make a will and dispose of his

property as he desired it to go. Joe thereupon asked Mr. Hamblen what the result would be if he left no will. He was advised by Mr. Hamblen of the result. He thereupon stated that he desired practically all of his estate to go to Mrs. Enos, and said he would consider the making of a will. This was in the spring of 1910. The next talk about a will was had with Mr. Hamblen by the testator in September, 1910, when he, in substance, told Mr. Hamblen that he had concluded that he would make his will. These conversations were not had in the presence of Mrs. Enos, but were held in the privacy of Mr. Hamblen's office. A day or two before the will was made, Mr. Enos came to Mr. Hamblen and requested him to prepare his will. Mr. Hamblen then asked Mr. Enos to whom he desired to leave his property. He stated that he desired to leave the bulk of it to his wife, but that he desired to make some bequests to Catholic institutions in the Azores islands. Mr. Hamblen then told him to get the names of the persons to whom he desired to make bequests. Joe then, with his wife, upon the next day, came to Mr. Hamblen's office, bringing a paper containing the names of legatees to be named in the will.

Mr. Hamblen had theretofore stated to Joe that, inasmuch as he had made his fortune in this country, he ought to leave a substantial sum to some local institution, and suggested the Young Men's Christian Association of Spokane. Joe made some inquiry as to this institution and agreed that he would leave $10,000 thereto. Mr. Hamblen then dictated a will as Joe directed, and when asked if he desired to leave anything to his brothers, said he did not. Mr. Hamblen then suggested that some nominal sum be left to them, and $5 was inserted in the will for each of the brothers. Afterwards when Joe and his wife came to sign the wills, they were read over to them. Joe concluded that he would change the amount to be given to the Y. M. C. A. of Spokane from $10,-000 to $5,000. The will was then redrafted and signed.

Mr. Hamblen testified that, at that time, and at the con-

versations upon previous occasions, the testator's mind was
clear, that he knew what he was doing, and that he made his
will without any other influence than as stated. Mr. Hamblen
also testified that, during the years he had known the testator,
they had been intimately associated in business affairs, that
he had been the testator's confidential and legal adviser, that
the mind of the testator was as clear as it had ever been, and
that, if Joe was addicted to the use of intoxicating liquors,
he, Hamblen, did not know it. There was much other testi-
mony to the same effect, but this, we think, is conclusive upon
the question. The rule is as stated in Schouler on Wills,
(3d ed.), § 236:

"The wife has been treated with a marked indulgence in
testamentary cases which involve issues of this kind; out of
consideration, as it would appear, to her sex and marital
position, which incline her to persuasive, tender, and persist-
ent, rather than overruling methods of influence, and to the
impression which popularly obtains, moreover, that a true
and faithful spouse is not likely to gain more under her hus-
band's will than she really deserves. Hence a wife's pleading,
and even her importunity with her husband, seldom avoids
a will made under its influence, so long as it may be supposed
that the husband weighed what she proposed and deliberated
for himself, and that she practiced no deception upon him;
and, generally speaking, a wife may justly influence the
making of her husband's will for her own benefit or that of
others, so long as she does not act fraudulently or extort
benefits from her husband when he is not in condition to ex-
ercise his faculties as a free agent."

See, also, Underhill, Wills, § 147.

This court in *In re Patterson's Estate,* 68 Wash. 377, 123
Pac. 515, said:

"To vitiate the will an influence must be shown which, at
the time of the testamentary act, controlled the volition of
the testator, deprived him of free will agency, and prevented
an exercise of his judgment and choice. He may have been
subjected to counsel, suggestion, persuasion or even impor-
tunity, yet if it be shown, as in this case, that he had testa-
mentary capacity, and at the time of making the will was

free and unrestrained in exercising his volition it cannot be held that undue influence has been shown."

And in *In re Tresidder's Estate*, 70 Wash. 15, 125 Pac. 1034, it was said:

"Nor will a showing of mere persuasion on the part of a beneficiary overcome the will of a party, if from the whole record it is made to appear that it is his will. It is not influence alone, but undue influence, which has been defined to be such an influence as deprives the party of the free exercise of his intellectual powers, an influence which is exercised by coercion, imposition, or fraud, an influence which impels the testator to act in fear, a desire for peace, or some feeling which he is unable to restrain."

It is apparent from the record in this case that no undue influence was exerted by Mrs. Enos upon her husband in the making of his will. He considered it for nearly a year. The record shows that he was slow to act in business transactions; that, while he sought the advice of his confidential advisers and friends, he acted at last upon his own judgment, and usually uninfluenced by solicitations or recommendations. We are convinced that, even though it be true, which we doubt, that he was addicted to the excessive use of intoxicating liquors before and at the time the will was made, and subsequently, the evidence clearly and persuasively shows that he was mentally capable of transacting any important business, such as the making of his last will, and that, at the time his will was made, he acted solely upon his own judgment, and placed his property where he desired it to go. In the case of *Hunt v. Phillips*, 34 Wash. 362, 75 Pac. 970, we said:

"A great deal is said in the elaborate briefs of counsel for appellants upon the duty of courts to construe wills with reference to the rights of heirs at law conferred by the law of descent and distribution. But the rights conferred by the law of descent and distribution are not more potent than the right conferred by the law to make a voluntary distribution of one's estate. It is doubtless true that the law of descent and distribution disposes of the estate, in the absence of tes-

tamentary disposition, in accordance with the dictates of common affection, but the right of independent disposition is just as absolute, and no presumption can be indulged in against the exercise of this legal right."

So here, while the law of descent and distribution without a will would have placed a larger portion of the property of the testator into the hands of his brothers and sisters than does the will, yet the testator had a right to make a will, and if he made it in his right mind in his own good judgment, and desired to leave but a pittance to his brothers and sisters, that was his privilege and his right. The record suggests a reason therefor which no doubt seemed sufficient to him. It was also the privilege of his wife to solicit him to make a will in which he should leave to her the larger portion or all of his estate. She was his lawful wife, and it was his duty to protect her by his will, and he evidently desired to do as he did in that respect. We are satisfied from the whole record that, at the time the will was made, the testator was fully competent to make it, and made it without any undue influence and that it was his will.

Counsel for the appellants insist that the court erred in not making an allowance for counsel fees and costs to the contestants. The statute, Rem. & Bal. Code, § 1313 (P. C. 409 § 127), with reference to proceedings of this kind, says:

"The fees and expenses shall be paid by the losing party. If the probate be revoked or the will annulled, the party who shall have resisted such revocation shall pay the cost and expenses of proceedings out of the property of the deceased."

There is no provision of the code which provides that the costs and expenses of an unsuccessful contest shall be paid out of the estate. And this court has held that costs should not be allowed in such cases. *In re Rathjens' Estate*, 45 Wash. 55, 87 Pac. 1070; *Hunt v. Phillips, supra*. Neither in law nor in good conscience do we think the unsuccessful contest of a will should result in costs and counsel fees against the estate. Such a ruling would, in effect, place a reward

upon the contest of every will disposing of large estates.   The trial court properly refused to make such an allowance.

The judgment of the trial court is affirmed.

Crow, C. J., Fullerton, Morris, and Parker, JJ., concur.