[No. 10416. Department One. August 26, 1912.]

## In re Estate of MARTHA J. TRESIDDER.[1]

HUSBAND AND WIFE—COMMUNITY PROPERTY—CONVEYANCE TO WIFE —FORM. Where the husband had charge of a transaction whereby property was conveyed to the wife, as and for her sole and separate property, the form of the deed is binding upon him, and the property becomes her separate property.

WILLS—EXECUTION—UNDUE INFLUENCE. Undue influence will operate to defeat a will, although the testatrix was mentally competent, where there was coercion, imposition, fraud, or influence impelling the testatrix to act in fear, desire for peace, or something which she was unable to restrain.

WILLS—UNDUE INFLUENCE—EVIDENCE—COMPETENCY. Undue influence in the execution of a will need not be shown by direct evidence, but it is competent to show the relations of the parties, the surrounding circumstances, habits and inclinations of the testatrix, and the fact that provision had been made for a son in four or five wills previously executed.

WILLS—CONSTRUCTION. A clause in a will asking the sole beneficiary to "make provision for my son R. as requested by me," must be construed in the light of several former wills in favor of R. and the circumstances surrounding its execution.

WILLS—UNDUE INFLUENCE—BURDEN OF PROOF. While ordinarily the burden of proof is upon the contestant of a will claiming undue influence, sufficient is shown to put the executor to his proof that there was no undue influence, where it was shown that the will was in the handwriting of the sole beneficiary, that although he knew of a former will in favor of a son, he kept its repudiation secret, and that he took care to have a physician act as witness in order to preserve proof of mental capacity, in view of former wills in favor of, and an admitted attachment for, the son.

SAME—EVIDENCE—SUFFICIENCY. In such a case, undue influence is sufficiently shown, where in addition to such facts, it appears that the testatrix, then on her deathbed, had, on the day before, executed

[1]Reported in 125 Pac. 1034.

a will making provision for a son, the next day executing the contested will making her husband her sole beneficiary with a clause asking that he make provision for the son "as requested" by her, that the testatrix was in a very weak condition, and had a great attachment for her son and frequently expressed an intention to leave him her property.

WILLS—PETITION FOR PROBATE—RIGHT TO WITHDRAW—ELECTION. The contestant of a will, who petitioned for the probate of a prior will, cannot, upon winning his contest, withdraw his petition for probate of the will proposed by him, nor waive a lesser share under such will to take a greater share under the statutes of descent.

Appeal from a judgment of the superior court for King county, Frater, J., entered November 6, 1911, upon findings in favor of a contestant of the probate of a will. Affirmed.

*Frank A. Noble* and *Peters & Powell*, for appellant.

*Brady & Rummens* (*W. D. Peters*, of counsel) for respondent.

CHADWICK, J.—Martha J. Tresidder and Thomas W. Tresidder were married in the state of New York, in the year 1890. At the time of their marriage, Mrs. Tresidder was a widow, with one son, Richard Seymour Conklin. A short time after they were married, Mr. Tresidder came west, and after a time he was followed by Mrs. Tresidder and her son. It is contended that the major part of the property owned by Mr. and Mrs. Tresidder at the time of her death was the accumulated earnings of the sums she brought with her from New York. Her son testifies that she had about her person a sum in excess of $9,000, when she left New York. We are inclined to believe that he is mistaken in this, for it seems that Mrs. Tresidder pawned her diamond earrings to bring the two of them from Bonner, Montana, to Seattle. The son, who was employed in a hotel, was left behind for a time. So far as the record shows, Mr. and Mrs. Tresidder struggled against adverse circumstances for several years. He followed various employments, and Mrs. Tresidder kept roomers and for a time worked in a real estate office.

In 1897, Mr. Tresidder induced a party with some capital to bank it against his experience, and they started a small lumber business. This was sold out in January, 1901, Mr. Tresidder receiving $8,400 for his share. On the 9th day of March, 1901, there was deeded to Mrs. Tresidder two lots in Union addition to the city of Seattle. The consideration was $2,700, and the deed recites that the property was sold and conveyed to Martha J. Tresidder "as and for her sole and separate property, use and benefit, and not as community property." There is much controversy over the status of this property, but it is our judgment that, wherever the money may have come from, the form of the deed (Mr. Tresidder having had charge of the transaction) would bind him to its terms, and that the property became the separate property of his wife. Prosperity measured in dollars seems to have followed the Tresidders from this time on. Mrs. Tresidder died May 22, 1910. The appraised value of the whole estate was about $67,000.

From the time that prosperity began to dawn on them, Mrs. Tresidder seems to have developed a penchant for executing wills, the first will being drawn in 1901 at about the time the property which became the home property had been deeded to her. This circumstance, though slight, tends to discredit the testimony of Seymour that Mrs. Tresidder brought $9,000 with her and had always been possessed of some means. People without means do not as a rule make wills, although our literature is adorned with one purporting to be the will of a pauper. We are, therefore, disposed to believe that the whole of the property, saving and excepting only the home property, is community property.

Mrs. Tresidder became ill of tuberculosis in 1909, and rapidly declined in health, and for a time before her death was unable to sit up in bed or to assist herself in any way. On May 18, at the solicitation of her son Seymour, Mr. Walter D. Peters went to the home of deceased, and in his presence and in the presence of one Margaret Hopkins, a trained

nurse, Mrs. Tresidder executed a will, the material parts of which follow:

"First: I give, devise and bequeath unto my son, Richard Seymour Conklin, of Seattle, aforesaid lot one (1), north five feet of lot two (2) of and in block sixteen (16) of Union addition to the city of Seattle, county of King, state of Washington, U. S. A., house and lot and all of its contents, and all of my personal property, including my jewelry, and the money in the Scandinavian-American Bank, of the aforesaid Seattle, Washington, of which I may die possessed.

"Second: I give, devise and bequeath all the rest, residue, of my estate be the same real or personal or mixed and wheresoever situated, equally unto my said son, Richard Seymour Conklin, and unto my husband, Thomas W. Tresidder, both of Seattle, Washington, share and share alike."

Her mental capacity to execute this will is not denied. Consequently we shall not discuss it. On May 19, so the testimony on behalf of Mr. Tresidder shows, Mrs. Tresidder told the nurse to telephone to Mr. Tresidder and ask him to come to the house. When he arrived she is reported to have said: "Oh, papa, I have done something I want to tell you about," that she then said that she had executed the will which we have just referred to, and that she felt that it was "forced on her." Mr. Tresidder then prepared in his own handwriting a will which his wife attempted to execute; but having misspelled her name, he made another draft of the will which was properly signed. The will is as follows:

"I Martha J. Tresidder, of Seattle, Washington, being of sound mind and fully able to make a will, do hereby will and bequeath all of my property both real and personal of which I may die possessed to my husband, Thomas W. Tresidder of Seattle, Wash.

"I ask my husband, Thomas W. Tresidder, to make provision for my son, R. Seymour Conklin, as requested by me.

"I appoint my husband, Thomas W. Tresidder as administrator of my estate without bonds.

"All other wills that may have been made by me before this are void."

This will was admitted to probate on June 1, 1911. On July 6, the son Seymour filed a contest, setting up that Mrs. Tresidder was not mentally competent to make the second will; that she had been overreached and unduly influenced by her husband who was made her sole legatee. He also offered the will first quoted for probate.

Without reviewing the evidence, we believe that, although Mrs. Tresidder was in a very weak and emaciated condition, she was nevertheless mentally competent in the sense that she understood what she was doing. The right of a party to change his will at any time, so long as he has capacity to do so, cannot be questioned. Nor will a showing of mere persuasion on the part of a beneficiary overcome the will of a party, if from the whole record it is made to appear that it is his will. It is not influence alone, but an undue influence, which has been defined to be such an influence as deprives the party of the free exercise of his intellectual powers, an influence which is exercised by coercion, imposition, or fraud, an influence which impels the testator to act in fear, a desire for peace, or some feeling which he is unable to restrain. 8 Words & Phrases, 7166, 7172. *In re Patterson's Estate*, 68 Wash. 377, 123 Pac. 515.

From the very nature of things, undue influence can rarely be proved by direct evidence. The relations of the parties, surrounding circumstances, the habits and inclinations of the testator, his purposes and wishes expressed at times when his words were clothed with the likelihood of truth, all furnish competent sources for the guidance of the courts when called upon to decide a case of this kind. *In re Patterson's Estate*, *supra*; *Rollwagen v. Rollwagen*, 63 N. Y. 504. There is no "uniform rule capable of application apart from the facts of each case." Wigmore, Evidence, § 2503.

To sustain the second will, the one proposed by Mr. Tresidder and admitted to probate, he seeks to show that the property was all accumulated through his efforts; and because of his business acumen, the mother felt that, because

of her son's habits, he being addicted to the use of intoxicating liquors and occasional sprees, he was unfit to handle money or property, and it was better to leave all of her property to her husband; that he was attached to his wife and she to him; that the son is a profligate and ne'er do well, and has been supported in the main by his stepfather and mother ever since their marriage.

On the part of the contestant, testimony has been offered to show that Mrs. Tresidder had frequently expressed the opinion that her husband had no affection for her; that she kept accounts and books and had money on deposit in her own name which was unknown to Mr. Tresidder at the time of her death; that she was deeply attached to her son and he to her, and on frequent occasions she had expressed her affection for him and her intention to leave him her property; that she had executed no less than five separate wills, in all of which she indicated an intention to provide for her son by way of specific devise; that she had executed a will in 1901 in which she had devised a part of her property to her husband, but thereafter, in all of the wills she had executed, she had favored her son to the exclusion or partial exclusion of her husband; that in one of these wills she had named a stranger as a joint executor to act with her son; that all of these wills had been concealed from her husband, as was also the fact that she carried money on deposit in her own name in the banks; that although contestant was in the house at the time the last will was drawn, its execution was concealed from him; that the will as drawn and probated in effect disinherited her son, and it is so understood by Mr. Tresidder, who served a written notice on Seymour to move out of the house a few days after his mother's death and to seek lodgings elsewhere. There is further testimony tending to show that the contestant is an architectural draftsman and has supported himself except during the two years just preceding his mother's death; that during that time he was in constant association with his mother, and nursed her up to a month or two preceding her

death; that he has contracted tuberculosis from his mother and is now its victim, and that this fact was known by her before she executed either of the wills now before the court. It is further shown that Mr. Tresidder drew the will with his own hand; that the deceased could not, or at least did not, spell her name correctly in the first draft of the will, and that a new one had to be made; that Mr. Tresidder waited until the next day in order to get the attending physician to act as a witness, and that he did this over the suggestion of the nurse, although neighbors were handy and might have been called. The position of Mr. Tresidder is strongly supported by the nurse, but her testimony is not entirely satisfactory, and it is evident that the trial judge did not credit it. She was, to say the least, neither a frank nor apparently a disinterested witness. Upon this showing and minor details, not now necessary to rehearse, the court annulled the order probating the will proposed by Mr. Tresidder.

It will be seen that the case is not without difficulty, which furnishes an additional reason for following the trial court in its judgment. "In cases of this character the conclusions of the surrogate are highly important." *Rollwagen v. Rollwagen*, 3 Hun 121. That there is something, or was something, connected with the execution of the last will that has not been disclosed, we have no doubt. It is indicated by all the proved facts. To ascertain the will of a party, it is proper to look to the purpose of the testator. The naturalness of the act is a strong supporting circumstance, and has ever been the readiest weapon of those who would sustain a will. That it had ever theretofore been the intention of the testatrix to care for her son there is not the shadow of a doubt. The four or five wills previously executed are competent evidence to prove this fact. *Seale v. Chambliss*, 35 Ala. 19. That Mrs. Tresidder was not unmindful of the care and attention and faithful devotion of her son is certain. Mr. Tresidder states that Seymour was very gentle with his

mother during her last illness. Having the means, she must have intended—in fact, the last will asserts, although ineffectually—that her son, who had so tenderly cared for her and whom she had provided for in her previous wills, should not go entirely stripped of her bounty.

We find, and we have no doubt that the trial judge found, the key to this case in the second clause of the will: "I ask my husband Thomas W. Tresidder to make provision for my son R. Seymour Conklin as requested by me." This clause should be construed in the light of all former wills and the circumstances surrounding its execution. We have no doubt that, when Mr. Tresidder found that his wife had made a will favoring her son, he put before her the same theory we find expressed in his testimony and maintained by counsel; that is, that the son was addicted to the intemperate use of liquor; that to leave him a part of the property would be to unnecessarily handicap a business that he had built up by his own efforts, and that if she would leave the matter to him he would do as she "requested." This clause indicates the true intention of the testator. What had she "requested?" Not merely that the son be provided for. If that were all, the use of the precatory words was sufficient, and the words "as requested by me" are redundant to that intention. The use of the words "as requested by me" (and we must give every word a meaning if we can) indicates a way, a manner, or a method. This then brings us to one of two propositions. Either the will operates to totally disinherit the son—and indeed Mr. Tresidder has put that construction upon it—or its meaning depends upon oral evidence which it is impossible to reveal, for it lies in the conscience of the sole legatee. The will "to provide . . . as I have requested" depends upon the unexpressed oral promise of the devisee. Dangerous indeed would be the doctrine that would sustain a will of that kind under the admitted facts of this case. There seems to have been no particular affection between the son and husband. There is no tie of blood. The

provision quoted, if the son was of tender years and the sole beneficiary was the father, would be a natural expression. But here it is highly improbable that Mrs. Tresidder rescinded the will and intent of years' standing, unless she had some specific promise to do as she requested. The will is in a sense the will, but not the whole will, of the deceased.

It may be noted as a circumstance sustaining our theory that the reason—the habits and ill health of the son—that must have prompted the suggestion that Seymour be provided for "as requested," is the very same reason urged by Mr. Tresidder for repudiating the duty to provide. The case of *Rollwagen v. Rollwagen*, 3 Hun 121; *Id.*, 63 N. Y. 504, is similar to this. The evidence there showed, that there was no real love between the husband and wife; that there was a bond of sympathy and affection between the deceased and his children; that the devises were exclusively for the benefit of the wife who proposed the will; that she had arranged and managed all details leading up to its execution; that the children of decedent were not apprised of what she was doing or had done; that he had executed previous wills dealing fairly with his children and grandchildren; that nothing was shown to have occurred in the meantime which could naturally be expected to produce changes in his intent and will. These facts, combined with his enfeebled condition, justified the court in rejecting the will, although there was no direct evidence of undue influence to sustain its judgment.

It is earnestly maintained that the burden of proof is on the contestant, and that this burden has not been sustained. This is true as a general rule, but when it is shown that the will as proposed is in the handwriting of the sole beneficiary; that, although he knew of the will in favor of the son, he did not bring the fact of its repudiation to his attention; that care was taken to have a physician act as witness in order to preserve the proof of mental capacity, we think enough has been shown, when considered in the light of the former wills

and the admitted attachment between mother and son, to put the executor to his proof that there was no undue influence. It is our judgment that this burden has not been sustained.

At the close of the trial, counsel for contestant withdrew his prayer for the probate of the will offered by him; this for the evident purpose of reducing the estate to one of intestacy. This he could not do. The original petition for probate of the repudiated will and its contest invested the court with jurisdiction of the estate, and under that proceeding, the court was vested with full authority and jurisdiction to administer the estate; and it appearing that the will offered by the contestant is a valid will, it becomes the duty of the court to execute it. The contestants are not alone concerned. The state has an interest in the administration of every estate, and its courts having acquired jurisdiction, it will be exercised to the end. Contestant might have withdrawn his contest, but he cannot withdraw his petition for probate of the will proposed by him.

"It would be a strained construction of the law as to probate of wills if the court should be compelled to hold that after a will was presented for probate, and presumptively proven by the executor [proponent or contestant], he could discontinue the whole proceedings. He was not a party to the record with any such power. The executor could not suppress a will before it be offered for probate or afterwards." *In re Lasak's Estate,* 57 Hun 417, 10 N. Y. Supp. 844.

See, also, *Bonds v. Gray,* 2 Ga. Dec. 136, pt. 2.

This is especially true where the effect of the waiver or dismissal would be to put the proponent in a better position than he would be in if he relied on the will. Mr. Tresidder has an equal interest in the residue of the estate under the will; whereas, if the estate be intestate, he would take nothing but his own share of the community property. We have found no case bearing directly on this point, but it may be resolved by reference to the doctrine of election. A legatee may elect to waive the greater and take the lesser share, but he cannot waive the lesser share under a will and take a greater share

under the statutes of descent. If it were so, it would be always possible to defeat the will and intention of the testator.

The decision of the lower court is affirmed, and the case remanded with instructions to proceed to execute the will proposed by the contestant.

Gose, Crow, and Parker, JJ., concur.