[No. 13985.   Department Two.   October 18, 1917.]

*In the Matter of the Estate of* PATRICK G. MURPHY.
CHARLES F. MURPHY, *Appellant*, v. JAMES E. MURPHY, *Respondent.*[1]

WILLS—TESTAMENTARY CAPACITY—EVIDENCE—SUFFICIENCY.   The probate of a will is properly set aside for want of testamentary capacity, where it appears that the testator was from 97 to 104 years of age, that he had been growing weaker in body and mind, imagined that friends and relatives were trying to poison him and were robbing him of his money, and upon a short visit to a son whom he did not wish to stay with, made the will in his favor under circumstances which make it very difficult to explain his actions and at the same time believe that he was not enfeebled in mind, such son having written letters stating that he was unable to care for himself and hinting at a guardianship.

WILLS—PROBATE—CONTEST—CITATION—SUFFICIENCY.   Under Rem. Code, §§ 1307 and 1308, requiring a citation on the contest of a will to be served on the executors, a citation directed to the executor personally and not as executor, is sufficient to give jurisdiction.

WILLS—PROBATE—BURDEN OF PROOF—PRESUMPTION.   While the burden is upon the proponent of a will to establish it as the last will of the testator, sanity and mental competency are presumed to exist until the contrary is shown.

SAME — FRAUD — UNDUE INFLUENCE — EVIDENCE — SUFFICIENCY. Fraud or coercion in the execution of a will cannot be found on the mere suspicious circumstance of a sudden revulsion of feeling on the part of the testator nor from the fact that he was living with a son whom he had favored in the will, in the absence of any evidence of fraud or undue influence at the time the will was made.

Appeal from a judgment of the superior court for Stevens county, Blake, J., entered June 20, 1916, upon findings in

[1]Reported in 168 Pac. 175.

favor of the contestant, setting aside the probate of a later will, and establishing a former one, after a hearing upon a contest before the court. Affirmed.

*Carey & Johnson,* for appellant.

*L. B. Donley* and *Davis & Heil,* for respondent.

Holcomb, J.—This is an action brought to set aside the probate proceedings had with regard to the will of the testator bearing date July 23, 1901, which was admitted to probate in the superior court of Stevens county, Washington, on December 15, 1914; and to have admitted to probate in its stead a purported later will of this same testator, Patrick G. Murphy, which will was executed in April, 1914.

Patrick G. Murphy died at the home of his son James E. Murphy at Velvet, not far from Northport, Washington, on November 23, 1914. His age, at the time of his death, cannot be determined with any accuracy, but from his own statements and those of his family and friends, it is thought he was from 97 to 104 years old. There survived him five children, three daughters and two sons. The sons are contesting in this action.

About nineteen years prior to his death, Patrick Murphy moved from Laramie, Wyoming, to Northport, Washington, to make his home with his son Charles F. Murphy. At this time, although well advanced in years, he was quite vigorous in mind, and it seems that he helped his son at that time in editing a newspaper. He continued to make his home with this son from that time until March 16, 1914, when he was taken by Charles to Velvet, for what was intended as a visit with his other son, James E. Murphy. When he came to Northport he had some property, and from time to time thereafter acquired more. For about eight years prior to his death he had a pension which amounted to $30 a month. All of this property he kept himself, and it is uncontradicted in the record that his son Charles bought him all of his

clothing and provided him with food and shelter during that time. Both parties to this controversy are agreed upon the fact that the old gentleman was miserly in his habits, and that he habitually entertained the most petty suspicions regarding the honesty of his sons and of others in whom he seemed to place some confidence. In the will of July 23, 1901, he makes minor bequests to his daughters and to James Murphy, and leaves the rest of his estate to his son Charles. In the will of April, 1914, which the lower court has held to be the last will of the testator and, therefore, the one which should be probated, the same minor bequests are made as in the former will, but the residue of his property is left entirely to his son James.

In this action, not only two brothers, but neighbors and friends are engaged in the dissension. From all the evidence, the following are the chief facts from which the appellant seeks to show that the later will was made when his father had not the proper mental capacity to make it, and that he was unduly influenced to make it because of the false representations of James E. Murphy and his wife. It appears that the deceased had, on many occasions prior to March, 1914, expressed great dislike for his son James. 'He also told divers persons that he "wished Charlie to have all of his property." James Murphy has at no time in this action attempted to show that he ever expended anything for the support or maintenance of his father before March 16, 1914. The transaction that seems to have been the beginning of the elder Murphy's repudiation of Charles was the making of a partnership agreement which they entered into on the 23d day of May, 1913. Charles had decided to go into the general merchandise business at the town of Parkwater, not far from Northport. He was erecting a building at a cost of about $6,000, and was in need of a little more money to give him something to do business on. His father had in the bank about $1,926. He gave it to Charles, and an agreement was drawn in which the father was given an interest

in the business. During the last few months preceding this
time, the testator's mind and body, in the opinion of some of
the witnesses, were growing more feeble. On January 15,
1914, he went to Parkwater to live with Charles. He began
to imagine that his friends and relatives were trying to poison
him; that the customers were stealing goods from the store;
became angry because he was not allowed to wait on custom-
ers, and thought that his son was robbing him because the
money in the till was not divided every night. He also be-
came so possessed with the idea that he would not get his
money back that his son, on March 7, 1914, made and de-
livered to him a note for $1,926. This note is written in
longhand and was dated March 7, 1904. This mistake was
not discovered until about ten days later. It was discovered
after Charles Murphy had taken his father to Velvet on
March 16, 1914. The father had become very anxious to
get back among his old friends around Northport. He
wished to go to Northport and keep house for himself.
Charles Murphy realized that he was not able to care for
himself, and suggested that he go to stay for a while with
James. This the old man did not want to do, but, after much
persuasion, he agreed to go for a few days, and it was a
part of this agreement that Charles was to take him there
and go back for him in a few days. Charles took him there,
and in about two weeks called to take him back, but the
father would not go. Appellant claims that he was willing
to go himself, but that the wife of James Murphy told his
father that he did not want to go. Murphy, Sr., did not
long want to stay at the home of James.

On the 18th of March, the day after he had discovered
the mistake in the note, he summoned a justice of the peace
—Lee—and had a will drawn, and a general power of at-
torney executed in favor of James Murphy. The circum-
stances of the alleged antedating of the note is made much
of by the respondent to show that the appellant was a party
to a scheme to rob the father. This we consider is a mistake

that might easily have been made by any one, even the respondent himself, being a mistake of merely a figure. The will, as drawn on the 18th of March, was taken to Colville in April by James Murphy, and a lawyer was consulted as to the form and contents. At that time a new will and power of attorney were drawn up and were taken to Velvet and there executed by the testator with all the formalities required by law. The witnesses were M. E. Hull and Alice Murphy, the wife of the respondent. All of these witnesses testified at the trial that the condition of the old gentleman's mind was the same as it had always been during the fifteen years or more that they had known him. Their testimony is contradicted by other witnesses.

It is very difficult to explain the actions of the testator, if truthfully described, after he had drawn his last will, and at the same time believe that he was not enfeebled in mind. There is testimony that he would ask those who came to the house of James Murphy to visit to take him away; said that he was about to be killed by poisoning; that they were holding him as a prisoner; and on one occasion he offered a witness $25 to take him away from Velvet. There are also in evidence letters written by James Murphy to the prosecuting attorney of Stevens county asking what might be done with the old gentleman. These letters state that the father was not able to take care of himself, and a guardianship is hinted at.

On December 15, 1914, the appellant filed his petition in the superior court of Stevens county, Washington, praying that the last will and testament of Patrick G. Murphy be admitted to probate and that letters testamentary issue to him as executor of the will and estate of Patrick G. Murphy, deceased, which petition was granted. Appellant then filed a general inventory, gave notice to creditors, and proceeded to administer the estate. On March 15, 1915, the respondent filed the petition in the same court praying that the purported will of April, 1914, be admitted to probate, and, at

the same time, filed his petition in contest of the will under which the appellant was administering the estate. Citation was issued commanding Charles F. Murphy to appear on April 5, 1915, and answer the petition contesting the will under which he was acting. Answer was made and affirmative allegations were included, setting forth facts intended to show testamentary incapacity, fraud, undue influence, and coercion upon the testator by contestant, and other affirmative defenses. A trial on the issues was had to the court and, after findings of fact and conclusions of law were made, a decree was entered in favor of respondent, setting aside the probate proceedings had under the former will and establishing the will of April, 1914.

Appellant first contends that the court never acquired jurisdiction over him by the citation issued, because the citation was directed to him personally and not to him as executor of the last will and testament of the deceased, and that he was, therefore, proceeded against merely as a legatee under the terms of the will of 1901.

This contention is based upon Rem. Code, §§ 1307 and 1308, which provide that, upon a petition being filed contesting the validity of any will, a citation shall be issued to the executors who have taken upon them the execution of the will, and to all the legatees named in the will, etc., requiring them to appear before the court on a day therein specified to show cause why the petition should not be granted. It is urged that this statute is mandatory and not merely directory, and provides exclusive proceedings in such matters.

A citation is the process designated by the statute in probate proceedings for bringing adverse parties into court. It is the counterpart of the summons in ordinary civil proceedings. The statute merely contemplated that interested parties are to be cited by a process called a citation in order to bring them and the controversy before the court. The mere addition to a name in a writ of words constituting the

title of representative capacity is not necessarily conclusive of the character in which the party sues or is sued, as, in many instances, such addition is merely *descriptio personae* and, as such, has no force in determining the character of the judgment, as where the action is maintainable only against the individual. 20 Ency. Plead. & Prac., 1135. An omission in an original summons against an administrator to designate his representative capacity will not, it has been held, render a summons void; the court should, upon motion or objection, direct it to be amended and should not quash it. *Richardson v. Hickman,* 32 Ark. 406.

If the person sued is properly charged as an executor, devisee, or in any other special capacity in the bill, it is no ground for demurrer that the subpoena is issued against him generally without stating the character in which he is sued. *Walton v. Herbert,* 4 N. J. Eq. 73. The appellant, by the form of the citation, lost no right to have the matter determined as provided by statute, and had every opportunity accorded to make his defense, even though he was not proceeded against technically as executor of the last will and testament. The contention is not tenable.

As to the merits of the controversy, it is true that a party who offers a will for probate must show satisfactorily that it is the will of the alleged testator, and upon this question he has the burden of proof. *Rollwagen v. Rollwagen,* 63 N. Y. 504.

The burden, therefore, was upon the respondent to establish the will offered by him as the last will and testament of the testator. But, on the other hand, sanity and mental competency are presumed to have existed until the contrary is established by competent proofs. The facts here are in utter conflict. In such a case, a trier of facts who had not the opportunity of directly viewing the witnesses and judging of their interest, bias, intelligence, credibility, and trustworthiness, is at the utmost disadvantage. The trial judge had the advantage of seeing and judging of the witnesses.

However, we do not find in the record even a scintilla of evidence that would substantiate the charge of fraud or coercion or of undue influence brought to bear by the respondent upon the testator at and before the time of the making of the last will. As we took occasion to say in *Points v. Nier*, 91 Wash. 20, 157 Pac. 44, suspicion, however great, is not enough to nullify it.

"This court has laid down the rule in the case of *In re Gorkow's Estate*, 20 Wash. 563, 56 Pac. 385, quoting from Redfield on Wills, as to what the quantum of mental capacity to make a will is, as follows:

" 'The result of the best considered cases upon the subject seems to put a quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should at the time of executing the will know and understand what he was about.'

"We hold the view that the right to dispose of one's property by will is one assured by the law and is a valuable incident to ownership, and does not depend upon its judicious use. *In re McDevitt*, 95 Cal. 17, 30 Pac. 101."

So here, while there are some circumstances which tend to indicate that there was a sudden revulsion of feeling on the part of the testator after he went to stay with his son James, that is no more a suspicious circumstance than that he was living with his son Charles when he made his first will and might, therefore, have been said to have been influenced in favor of Charles and against James at that time.

"To vitiate a will there must be more than influence. It must be *undue* influence. To be classed as 'undue,' influence must place the testator in the attitude of saying: 'It is not my will but I must do it.' He must act under such coercion, compulsion or constraint that his own free agency is destroyed. The will or the provision assailed does not truly proceed from him." *Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634, 22 L. R. A. (N. S.) 1024.

Such seems to have been the situation in the case of *In re Tresidder's Estate*, 70 Wash. 15, 125 Pac. 1034, largely

relied upon by appellant, in which case the testatrix made a declaration that what she had done had been forced on her. There is no such condition of affairs shown to exist in this case.

We cannot discover, from a search of the record, such a preponderance of evidence against the findings of the trial judge as to justify their overturning. Under the rule laid down as to the *quantum* of understanding requisite to the valid execution of a will, the respondent certainly sustained the burden of proof, in the view of the trial judge, to show such testamentary capacity. One of the most extreme cases that has ever been before our court was that of *In re Gorkow's Estate, supra*, and the testator in this case seems to have been at any rate more competent than the testator in that case. The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity and no undue influence or fraud, the law will give effect to his will even though its provisions are unreasonable and unjust. *Clapp v. Fullerton,* 34 N. Y. 190, 90 Am. Dec. 681; *Mitchell v. Mitchell,* 43 Minn. 73, 44 N. W. 885; *Potter v. Jones,* 20 Ore. 239, 25 Pac. 769, 12 L. R. A. 161; *Hunt v. Phillips,* 34 Wash. 362, 75 Pac. 970; *In re Rathjen's Estate,* 45 Wash. 55, 87 Pac. 1070.

The last case also disposes of appellant's claim of error as to the apportionment of costs and assessment of costs against appellant individually and not entirely out of the estate.

Finding no error, the judgment is affirmed.

ELLIS, C. J., PARKER, and MOUNT, JJ., concur.