[No. 30022.   Department Two.   March 27, 1947.]

*In the Matter of the Estate of* ALEX JAASKA, *Deceased.*
ANTTON JAASKA, *Appellant,* v. ALEX H. JAASKA, *as Executor,*
*Respondent.*[1]

*Warner Poyhonen* and *Lester Stritmatter,* for appellant.

*H. E. Grimm,* for respondent.

HILL, J.—Alex Jaaska died in the Oakhurst sanatorium, near Elma, Washington, on May 18, 1945, at the age of

[1]Reported in 178 P. (2d) 321.

seventy-eight. The cause of his death was given as "far advanced pulmonary tuberculosis." On May 8th (all dates herein referred to are in 1945 unless otherwise indicated), he had signed the document which, on May 28th, was filed for probate as his last will and testament and which was admitted to probate, as such, on July 16th. It is conceded that this document was signed by Alex Jaaska, and by Mary B. Woodhull and Jake O. Salo. The last two named signed the usual form for "Testimony of Subscribing Witness on Probate of Will" on the date last referred to.

If said document be in fact the will of Alex Jaaska, his property is bequeathed and devised as follows:

Lot 1, section 7, township 15 north, range 4 west of W. M., situate in Thurston county, Washington, and containing 13.45 acres, more or less, to Alex H. Jaaska, a nephew of the decedent (note the initial "H," as it will serve, throughout this opinion, to distinguish the nephew from the decedent); and all the rest of his real property to Arne Aldolph Jaaska, a son of the said Alex H. Jaaska; five hundred dollars each to two nieces in Finland; and the remainder of his personal property to said Alex H. Jaaska, who also was named as executor in said will, and who apparently qualified as such.

In addition to the real property specifically devised to Alex H. Jaaska, which was appraised at five hundred dollars, the inventory and appraisement shows ten different tracts of land comprising 138.58 acres, more or less, and appraised at $6,550. The personal property, which included $2,190.53 cash, was appraised at $2,245.53.

A brother, Antton Jaaska, filed a petition on November 9th, asking that the will be set aside, on the grounds (1) that the decedent was not competent to make a will, and (2) that the will was the result of undue influence exercised by Alex H. Jaaska. A hearing was had on this petition in January of 1946, and, on March 4, 1946, the superior court of Thurston county entered an order dismissing the petition, from which order this appeal is prosecuted.

It appears from the petition that the heirs at law of the decedent are a brother (the petitioner) and five children

of a deceased brother. These five children include the said nephew, Alex H. Jaaska, and the two nieces in Finland named in the will, together with Tyyko Jaaska and Hilda Widenoja, who were witnesses at the hearing.

We present herewith a brief sketch of the relationship of the interested parties and of the situation as it existed in the latter part of April, 1945:

Alex Jaaska was seventy-eight years of age and had been in the United States for more than fifty years. He operated a small store and gasoline station across the road from his home at Helsing Junction, on Independence road in Thurston county. He had lived in that neighborhood continuously since sometime prior to 1911, and had been a widower since 1913. He was a Finn, and his knowledge of English was limited, although he spoke it and understood it sufficiently to carry on business with his English-speaking customers. The extent to which he read English and understood what he read, is one of the pivotal points in this case and will be discussed later. He was then in the terminal stages of tuberculosis, although it would appear that he did not know the nature of his illness, nor did his friends and relatives. For some little time, he had kept the store locked, and customers had to go across the road to his home to get him to wait on them.

Antton Jaaska, the appellant here, was eighty-three years of age and a brother of Alex. The latter had sent Antton money to enable him to come to Washington. The two old men had "batched" together for twenty years, and Antton had helped Alex somewhat with the store and gasoline station. They had differences but apparently none of a serious nature, although Alex may have regarded Antton as something of a "dunce or mixed up in the head." It does not appear from the record that Antton had any means of his own, and he was apparently dependent on the good will, or charity, of his brother.

Alex H. Jaaska, who, as executor, is respondent here, was a nephew of both Alex and Antton. He first came to this country in 1922, returned to Finland in 1930, and again entered the United States in 1938 and has lived at Helsing

Junction since that time. He was married and had four children. (At the time of the hearing, their ages ranged from nine to thirteen years.) Alex helped Alex H. get into the United States and had rented some land to him continuously since 1938. Alex H. bought a place of his own in 1941, and his home was "right close" to that of Alex. He testified:

"I help him all the help he need. I help in the store. I get some groceries and I sell some wood for him, and all the kind of help he need."

Arne Aldolph Jaaska, nominally the principal beneficiary under the will of Alex Jaaska, is a minor son of Alex H., but whether the oldest or the youngest is not clear, as the record shows that his father testified as follows:

"Q. [Mr. Grimm] He liked one of your children pretty well, didn't he? A. Yes, he liked my *youngest boy* the best of all. He like all my children. Q. What is the *oldest* boy's name? A. Arne. Q. He is the one that is mentioned in the will? A. Yes." (Italics ours.)

It may be that Mr. Grimm meant "youngest" in his question, and that Alex H. so understood him.

Tyyko Jaaska is a brother of Alex H. and, of course, a nephew of Alex and Antton. He came to this country from Finland in 1922. From 1925 until he moved to Tacoma in the spring of 1945, he lived on a farm about a mile from Alex. Thereafter, he came down from Tacoma every week. He had worked for Alex many times.

Hilda Widenoja is a sister of Alex H. and Tyyko Jaaska, and a niece of Alex and Antton. She had known Alex since 1911, and had lived about a mile from him for many years. She saw him "sometimes once a week and sometimes about two weeks."

The two nieces of Alex who each receive five hundred dollars, by the terms of the purported will, lived in Finland. Alex had not seen them since he came to this country more than fifty years before. He had not heard from them since the beginning of World War II.

Against this background, the story unfolds rapidly between April 19 and May 18, 1945. Alex sent word to John

A. Widenoja (the husband of Hilda) on April 19th that he was ready to go to a hospital, but a few hours later he decided that he did not want to go. On April 24th or 25th, he fell and was unable to get up until Alex H. came to his aid. From that time on, he was bedridden and unable to move without assistance. On April 28th, Alex H. sent word to John A. Widenoja that Alex was then ready to go to the hospital, and Mr. Widenoja assisted in taking him to St. Peter's hospital in Olympia. Alex H. testified as follows:

"Well, we helped him downstairs, yes. He want to sit down in rocking chair when he got down to the kitchen, and I think one time he sit down about an hour. We ask him many times if he is tired, but he is not tired, he just like to sit down there and *he tell his brother to make good fire* because he feel kind of chilly, make good fire in the stove." (Italics ours.)

Mr. Widenoja testified that they "mostly carried him" to Alex H. Jaaska's car. Alex H. told how Alex asked him "to take care of all his business when he was away," and he further said that Alex "gave me the keys and things when he left."

While at St. Peter's hospital, Alex was attended by Dr. K. L. Partlow, who saw him every day from April 28th to May 3rd, but who was unable to understand anything he said except that he was dizzy and cold. The doctor said that Alex had no control over his bladder, slept most of the time, and was markedly senile. He further testified that, during the period Alex was in the hospital, he was "absolutely unable to transact any business, to say nothing of making a will."

On May 3rd, Antton Jaaska and the Widenojas, Hilda and John, visited him. He was dissatisfied, and the first thing he told them was that he wanted to get out of there. He said that he had not seen a doctor; blamed his condition on a dentist to whom he had paid two hundred dollars; and wanted to go home, or "any place else." They secured an ambulance, and Hilda rode with him to St. Helen's hospital. in Chehalis. Here, for the first time, his condition was diagnosed as tuberculosis. The hospital did not want to re-

ceive him and insisted that he should go to a tuberculosis sanatorium, but he was permitted to remain overnight.

There was no place then available for him at the sanatorium of his choice (Oakhurst, near Elma), so on May 4th, Alex was taken back to his home. He traveled lying in the back seat of Alex H.'s car. Hilda rode in the back seat with him, and, when his feet became cramped, he asked her to straighten them out.

Alex H. was accompanied on this occasion by his wife, Anna. He testified that Alex wanted to return to his home before going to Elma, and that, while at Chehalis, Alex spoke to him about a will. Neither Hilda nor his wife heard anything about a will. Significantly, of all the witnesses called in this case, no one heard Alex refer to a will except Alex H.

Alex remained at his own home from Friday, May 4th, until Monday, May 7th. During that time, he was cared for by Antton, Alex H. and his wife, and Hilda. Hilda came in every day and was there all day on Saturday.

Sunday, May 6th, some neighbors and friends came to see him, among them Tyyko Jaaska and Sylvia, his wife, Peter Hotta and Rose, his wife, and Andrew Asuga. Some of these people he recognized; others he did not. Some of them, including his nephew Tyyko and his wife, were not sure whether or not he recognized them.

Monday, May 7th, and Tuesday, May 8th, are all-important days in this case. Sometime before noon on May 7th, Matt Hyyppa and his wife came to the house on a combined business and social call. Alex told them that the sales tax on cigarettes was three cents on the dollar, and he knew that he had six-penny nails in the store. The actual business was transacted with Antton, and they were in the room with Alex for only a few minutes. They were not sure whether he recognized them but thought that he did.

We have two versions of what happened that afternoon. Alex H. said that sometime that afternoon Hilda came to his home and suggested that they might get Alex admitted to the Rock Creek sanatorium, near Pe Ell, until a place became available for him in the Elma sanatorium (Oak-

hurst). What happened then, we will let him tell in his own words:

"A. I said we can take him if he want to go, and I told him, I go to ask him if he want to go to Rock Creek. I went and ask him then and he say yes, he want to go, but before he go he want to make a will, and then he start to say—(interrupted) . . . Q. Can you remember now just what he told you? A. Yes, I think so. I am not sure. He said that land, a separate piece that is at the river, thirteen and a half acres, he want to give to me and then all the rest of his land to my boy, Arne, and then to my sisters in Finland he wants to give five hundred dollars each. Q. To each one? A. Yes, back in Finland. Q. How many are there? A. Two of them. And then all his personal property he wants to give to me, and if he has got some money left after he die, he wants to give to me, too. Q. He wanted you to have that? A. Yes, if he has got more money left after he has gone. Q. Did he tell you where you should go to have the will drawn? A. Yes, go to see Mr. Grimm and ask him to make it and he is going to sign if Mr. Grimm make it, and he said if Mr. Grimm don't make it, then ask him to come and see him. Q. He wanted me to come and see him? A. Yes, to come and see him. Q. So then you came to see me about making a will? A. Yes, that was late afternoon, and I told him it was four or five o'clock already and too late to go and see you that day, and I told him I go to see you tomorrow, the next day. Q. That was what day? A. That was May 7th, and I tell him I go to see you the next day."

He testified that Alex said nothing about his brother Antton, his nephew Tyyko, or his niece Hilda. On cross-examination, the following questions were asked and answers given:

"Q. Did you ask him if he wanted to leave Antone anything? A. I don't ask him, no. . . . Q. Did you ask him whether he wanted to leave Hilda anything? A. No, I didn't because that is not my business to ask. . . . Q. And did you ask him about whether he wanted to leave Tyko anything? A. No. I don't ask him. That is not my business to ask him who he wants to give it to."

He further testified that the ambulance did not come to take Alex to Rock Creek until five or six p. m.

440

Hilda said that she was at Alex's home when the ambulance arrived, and that it was during the afternoon. She stated that she had been there two or three hours before it came, and that, during that time, Alex was awake part of the time and asleep part of the time.

Ericka N. Haapanemi testified that he was in the house sometime during the afternoon, about four or five o'clock and just before the ambulance arrived, and that Antton, Hilda, and Alex H. and his wife were all there.

Mary B. Woodhull, the head nurse at Rock Creek sanatorium, said that Alex was brought in between one and five p. m., and that he was a very sick man. She continued:

"In fact, when he first came there we had to wait a little while before we could tell much about him; he was so weak from the journey that he had to be taken very special care of."

Alex was placed in a ward with a number of other patients and remained in that ward until his removal from the sanatorium on May 12th.

Alex H. went to Centralia on the morning of May 8th, the day after Alex was removed to Rock Creek. He met Jake O. Salo on the street. He did not remember where nor on what street; and Mr. Salo was even more indefinite as to where he met Alex H., stating that it was either on the street or in some store, tavern, or pool hall. Tyyko Jaaska testified that Mr. Salo had told him that they went first to the office of a Mr. Cunningham, an attorney in Centralia, but that, Mr. Cunningham being in Chehalis, they went to Mr. Grimm's office. Mr. Salo denied that he had made such a statement to Tyyko and denied, further, that they had gone to Mr. Cunningham's office. This was quite material, because, if Alex had actually instructed Alex H. to go to Mr. Grimm, there was no reason for him to go to Mr. Cunningham's office. In any event, sometime during the morning of May 8th, they did go to Mr. Grimm's office.

Although Alex H. testified with great particularity and clarity as to what Alex had told him, Mr. Salo testified that he had to interpret for Alex H. while they were in Mr. Grimm's office.

"Q. And what Mr. Grimm couldn't understand Mr. Jaaska [Alex H. Jaaska] told you in Finnish and you told Mr. Grimm? A. Yes. Q. The same thing in English? A. Yes, some words in English, yes."

There was considerable discussion about whether any writing was taken to Mr. Grimm's office, and Mr. Salo testified positively that there was none.

"Q. Well, did he give it to Mr. Grimm orally, did he speak to him or read it from a paper, or just what was done about that? A. No, he didn't read it from a paper, no. Q. Was there a paper? A. What was written on that will is all that I know of. Q. The only writing was the will itself? A. Yes. Q. There was no other papers? A. No. Q. And so Mr. Jaaska told Mr. Grimm just by word of mouth? A. Yes. Q. What was supposed to be in it. A. Yes."

The will prepared by Mr. Grimm accurately set forth the wishes of Alex as Alex H. testified they were transmitted to him on the previous afternoon, even, *mirabile dictu,* to the proper legal description of "that land, a separate piece that is at the river, thirteen and a half acres," for there is a specific devise

". . . unto my Nephew, Alex H. Jaaska, the following described property situated in Thurston County, State of Washington, to-wit: Lot One (1) in Section 7, Township 15, North of Range 4, West of W. M., containing Thirteen and Forty-five hundredths (13 45/100) acres, more or less."

Mr. Grimm was unable to accompany them to the sanatorium but gave them instructions with reference to the execution of the will. Mr. Salo and Alex H. proceeded to the Rock Creek sanatorium and entered the ward where Alex was in bed.

We again have two versions of what happened. Mr. Salo said that they raised Alex into a sort of sitting position and put a pillow behind him so that he could read the will. He apparently read it aloud. Mr. Salo twice described the reading.

"When we took the will out there it was written in English and when we handed it to the old man there, why, he started to read it, and so I asked him if he could read it or if he needs help I can help him out, I could interpret some

words that he didn't understand, but he told me that he could make it all right by himself so he didn't need help. That is what he told me. And a little later on, of course, he kept on reading until he was just pretty near through with it, I asked him the second time how it was made or drawn and he told me that it was drawn just exactly the way that he wanted it to be done; that is what he told me. Of course, during that time while he was reading that he had to have a drink twice, a bottle of soda pop that he had

". . . and after he started reading it, of course he spoke in a kind of low tone, that is, it seemed low, his throat was kind of blocked up, it was in a whispering tone, and pretty soon he wanted a glass of water or glass of something to drink so his nephew handed him a glass of water or a bottle of soda pop there. That is what it was. And so he took a drink and it seemed to kind of clear his throat a little bit so he could speak a little louder so we could hear him pretty well then for a while. And he kept on reading this will, and before he was pretty near through with it he wanted another drink of this soda pop. I think it was orange. And he took another drink and then he finished his reading on this will."

The reading took ten or fifteen minutes. Alex did not ask them to explain anything to him. He told them that it was made the way he wanted it. If reiteration is sufficient to make a statement true, Mr. Salo and Alex H. certainly have established that Alex told them that it was "made the way he wanted it to be made." Mr. Salo repeated it six times and Alex H. twice.

We come now to the actual signing. Mr. Salo said:

"She [Mary B. Woodhull] had many patients there to take care of, and she kept running from one bed to another in that ward, and pretty soon after the old man had read this last will, why, Mrs. Woodhall, she happened to slip into the other room there and this Mr. Alex Jaaska, he went after her for a pencil because the old man wanted to write his name on this will that he had just finished reading. Well, pretty soon in just a few moments Mrs. Woodhall came back with a pencil to Mr. Jaaska, so we signed that. Mrs. Woodhall, she took that will and she looked at it, and then she signed her name and I signed mine. Now, I don't remember whether I signed first or whether she signed first; anyway, she signed in my presence."

The other version of what happened that afternoon of May 8th in the Rock Creek sanatorium is given by Mrs. Mary B. Woodhull, a Quaker lady who had been a nurse for twenty years but who never previously had been a witness to a will. She stated that she was in the room all the time that Alex H. and Mr. Salo were with Alex. She was positive that Alex did not read the will and that it was not read to him. An excerpt from her testimony follows:

"Q. Were you there all the time that Mr. Jaaska and Mr. Salo were there? A. Yes, I was there. Q. Did Mr. Jaaska, that is the sick man, did he read that will in your presence? A. Oh, no, he couldn't read the will. The will was not read while I was there. Q. Did anyone else read it to him? A. No. Q. And you are positive about that? A. I don't know a word of that will and if it had been read I certainly would have known something about it."

Alex H. told her that it was a will, and she saw Alex sign his name, at the direction of Alex H. Her testimony on that point follows:

"Q. You saw him [Alex Jaaska] sign his name? A. Yes, I saw him sign his name. Q. Did somebody tell him to sign? A. They told him where to sign. Q. Who told him? A. His nephew. Q. Do you remember what he said? A. Just told him to put his signature on the will. Q. Was Mr. Jaaska in bed at that time? A. Oh, yes, he never set up all the time he was there. Q. Did he sign that will lying down? A. Yes. Q. Was he propped up at all, or just signed it lying down? A. Signed it lying down. I may have raised his head a little bit with the pillow. I don't remember, but he was lying down on the bed when he signed his name."

She then signed her name at the request, not of the testator, but of Alex H. She was not sure whether Mr. Salo signed at the same time she did; she did not notice that he did, but she could not say he did not.

Much was made of the fact that Mrs. Woodhull had appeared as one of the subscribing witnesses when the will was admitted to probate. There was nothing to indicate whether her examination on that occasion was detailed or *pro forma*. She had signed one of the usual forms, entitled "Testimony of Subscribing Witness on Probate of Will,"

444

which contained a recitation of competency, etc. This she explained, and to our satisfaction, by saying that when she signed the will as a witness she thought she was "doing a favor to a poor sick man." She was asked if there was any discussion of the terms of the will, and she replied:

"No. I know nothing about the will at all. All that I knew was that I should witness the man that signed it so in case anyone said was that Mr. Jaaska's handwriting I could say yes I saw him sign it,"

and that was what she thought she was doing when she testified as a subscribing witness to the will. She did not attempt to pass on Alex Jaaska's competency to make a will, except to say that if, by her signature, she was certifying as to his competency, she thought she would have refused to sign; and she quite capably defended her position on cross-examination, as the following questions and answers will indicate:

"Q. You also told me concerning this that he was of perfectly sound and disposing mind and memory, didn't you? A. Hardly. He was a sick man. Q. You don't mean to say that you didn't tell Judge Wright the same thing here? A. As far as he could. He wasn't a man that was entirely out of his mind. He wasn't insane or anything, but he was very weak. Q. Very .weak and sick, yes. A. Yes. Q. You never intimated to me or to Judge Wright or anybody else that I know of, that he wasn't of sound mind, did you? A. I wouldn't say now that he wasn't of sound mind excepting he was a sick man. I don't know what he would be like if he was a well man because I had never seen him. Q. There was nothing in his talk or actions to indicate to you that he was of unsound mind? A. Well, when a person is as sick as that you wouldn't say he is in a strictly sound mind, would you? You wouldn't say he was insane? Q. Every T. B. person that you have waited on, that gets in advanced stages of T. B., would you say they are of unsound mind? A. I didn't say unsound mind. I say their mind is weakened by the disease."

The story of the remaining ten days of Alex Jaaska's life is quickly told. Hilda, Antton, and Alex H. and his wife visited him on May 10th. Hilda said Alex tried to talk a little but began to cough and went into a coma. Alex H. and

his wife testified that he said something about a haircut and paying the barber and talked "all right."

On Saturday, May 12th, Alex Jaaska was transferred by ambulance to Oakhurst sanatorium, near Elma. Alex H. went to see him there right after noon on that day, and said that he was capable of talking business affairs. On Sunday, May 13th, Alex H., Antton, and Mr. Hotta went to see him, and he told Alex H. where some blasting caps were that he, Alex H., needed for clearing land. Mr. Hotta did not know whether or not Alex recognized him.

On Wednesday, May 16th, Hilda, Antton, and Ericka Haapanemi visited him. He said some rational things, such as inquiring about Hilda's husband, asking Mr. Haapanemi what he was doing, and asking why Arne did not come to see him. He also talked about a witch woman and wanted to get away from the sanatorium. (Hilda fixed this date as the day before he died, which would have been May 17th, but Mr. Haapanemi said that it was on the 16th.) On Friday, May 18th, he died.

Dr. John Srail, superintendent and medical director at Oakhurst sanatorium, who saw Alex Jaaska first on Sunday, May 13th, or Monday, May 14th, was unable to get any intelligible statements from him during the time that he was in that institution. The doctor did not believe that Alex was mentally competent to make a will at any time during the period of his observation. On cross-examination, Dr. Srail was asked if "it would have been possible for him to be roused and be all right a number of days previous to that, say on the 8th of May, sufficient to make a will," and his reply was, "Well, it may have been possible."

There is no testimony that Alex carried on any conversations in English during the last three weeks of his life. Neither Dr. Partlow, at Olympia, nor Dr. Srail, at Oakhurst sanatorium, could get any intelligible responses from him. The nurse at the Rock Creek sanatorium talked to him only about his food and medicine. With his Finnish friends and relatives, there were doubtless many occasions when he roused himself, recognized them, and made intelligent remarks. It is notable that all the conversations testified to,

except that with Alex H. on May 7th, were brief and concerned one or perhaps two simple incidents. It is likewise undoubtedly true that there were occasions when he did not know friends and relatives, or when they could not be sure that he recognized them. Two of the witnesses testified that, after he talked a little while, he would have a coughing spell and go to sleep, or lapse into a coma. Sometimes he would be irrational and talk about witches or blame the dentist for his condition, and want to get away from wherever he was. Even Alex H. Jaaska admitted that he became weaker and weaker after his fall about April 24th or 25th. In short, we have an old man, in the terminal stages of tuberculosis, sometimes roused and sometimes comatose.

We will not pass on the capacity or competency of Alex Jaaska to make a will on May 7th or 8th. We cannot say that, given adequate time and assistance, he could not have made his wishes known and that a valid will could not have been prepared. However, almost every fact and circumstance surrounding the will which was prepared points unerringly to fraud and undue influence. In *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331, we said:

"Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will."

In *Foster v. Brady,* 198 Wash. 13, 86 P. (2d) 760, the same quotation appears, the principles therein set forth were applied, and an order dismissing a will contest was reversed.

Let us now apply the tests referred to in the *Dean* case

and the *Foster* case, to the facts and circumstances now before us.

(1) *Fiduciary or confidential relationship of beneficiary to testator.* Alex H. Jaaska was a nephew of the testator and lived very near him, farmed his land, and assisted him generally. When the testator went to the hospital, he turned over his money and his keys to the beneficiary. There was clearly established a relationship of trust and confidence.

(2) *Beneficiary's active participation in preparation or procurement of will.* Whether or not the decedent desired to make a will and, if so, what the terms were to be, only the decedent and Alex H. Jaaska knew. The lips of the former are forever sealed. It is obvious that there would have been no will if it had not been for the participation of Alex H. Jaaska.

(3) *Receipt by beneficiary of an unusually or unnaturally large part of the estate.* Had the decedent died intestate, Alex H. Jaaska would have received one tenth of the estate. The estate was appraised at $9,295.53. Under the terms of the will, he receives a tract of land appraised at five hundred dollars and the personal property, appraised at $2,245.53, but from which must be paid two bequests of five hundred dollars each, and the costs of administration. Should either or both of the legatees in Finland be dead, he would, as residuary legatee, also receive the amount of their legacy or legacies. All the rest of the estate is devised to his young son, and the advantage to Alex H. Jaaska of such a devise requires no comment.

There was left, with no portion of the estate, an eighty-three-year-old brother who had "batched" with the decedent for twenty years, and who had assisted him around the store and had helped to take care of him during his illness. Antton apparently was dependent upon the decedent for support, and the failure to make any provision for him in the will was unnatural and unexplained.

A nephew, Tyyko Jaaska, and a niece, Hilda Widenoja, likewise were not mentioned in the will, despite the fact that during the days just prior to the making of the will Hilda had been with the decedent frequently, had taken him

out of St. Peter's hospital at his request, and had ridden with him in the ambulance from Olympia to Chehalis. She had been with him in the back seat of the car from Chehalis to his home and had tried to make him comfortable, and had assisted in taking care of him in his home from May 4th to 7th, inclusive, staying all day on May 5th.

We now desire to call attention to a whole series of suspicious circumstances which tend to strengthen the presumption of fraud and undue influence.

(a) No one except Alex H. Jaaska heard the decedent say anything about a will.

(b) Alex H. Jaaska is not only uncorroborated but is contradicted in his statement that he was alone with the decedent at four or five o'clock on the afternoon of May 7th, when he was supposed to have received detailed instructions regarding the terms of the will.

(c) Alex H. Jaaska, feeling the need of assistance in interpreting the decedent's desires to his attorney, nevertheless left the Finnish community where he lived without taking an interpreter, and drove to Centralia and then, without any prearrangement, met Jake O. Salo, though neither of them recalled exactly where they met.

(d) Both Alex H. Jaaska and Mr. Salo insisted that no paper was taken to the attorney's office and that the instructions given to the attorney were oral, yet even the legal description of the property devised to the former appears in the will.

(e) Both Alex H. Jaaska and Mr. Salo insisted that the decedent sat propped up in bed and read the will aloud, during a period of perhaps fifteen minutes. This is contrary to the testimony of Mary B. Woodhull, the nurse, and would seem to be manifestly impossible, from all the other testimony in the case regarding his physical condition.

Our conclusion that he is supposed to have read the will aloud, is based upon the fact that both Alex H. Jaaska and Mr. Salo insisted that he asked no questions concerning the will, and required no aid in understanding it, yet apparently was talking all the time he was reading it. We quote again

from Mr. Salo's testimony concerning the reading of the will:

" . . . and after he started reading it, of course *he spoke in a kind of low tone,* that is, it seemed low, his throat was kind of blocked up, it was in a whispering tone, and pretty soon he wanted a glass of water or glass of something to drink so his nephew handed him a glass of water or a bottle of soda pop there. That is what it was. And so he took a drink and it seemed to kind of clear his throat a little bit *so he could speak a little louder so we could hear him pretty well then for a while. And he kept on reading this will,* and before he was pretty near through with it he wanted another drink of this soda pop. I think it was orange. And he took another drink and then he finished his reading on this will." (Italics ours.)

(f) Whether he read the will aloud or to himself, the statement by both Alex H. Jaaska and Mr. Salo that Alex Jaaska had no questions, and that he understood the will, is unbelievable. We have a nonintervention will in the usual legal phraseology, and a man whose understanding of English was very limited. We are expected to believe that he understood, without asking questions, "my position and station in life," "devise and bequeath," "wherever situate lying and being," "without the intervention of the Probate Court," etc.

We review, briefly, the testimony concerning Alex Jaaska's knowledge of and familiarity with English and his ability to read it. We quote from the testimony of Alex H. Jaaska:

"Q. Well, there are a lot of Finns down in that Independence country? A. Yes. Q. And there are some English-speaking people there, too? A. Yes, some of them, but not very much. Q. He got along all right with any of them, didn't he? A. Well, I think so. Not very good, but I guess he make it some way. . . . Q. He understood speaking and understood English just as well as you do, didn't he? A. Well, I can't say, I don't know. Q. Do you think you are better than he was? A. I am not very good myself. I don't know, I couldn't say that. Q. But he got along all right? A. Well, not very good, but some way; of course, I don't get along very good, either, but get along some way."

The only persons to mention his reading of English were Alex H. Jaaska and Mr. Salo. Salo testified as follows:

"Q. And he read an English newspaper, did he? A. He used newspapers; that is, he read the newspapers. He was getting the Seattle Times and the Tacoma Times sometimes. Q. When he was in business? A. Yes, he had to. Q. And he understood what was going on in the world pretty well, did he? A. Yes. Q. Did he read the produce market items and those things? A. Yes, sure."

And Alex H. Jaaska testified:

"Q. And he used to read an English newspaper, the Seattle Times or something like that? A. Yes, *he ordered them, anyhow,* and Finn papers, too." (Italics ours.)

■ We hold that the facts presented by the appellant raised such a presumption of fraud and undue influence as to place upon the respondent the burden, to quote the *Dean* case, *supra,*

". . . to come forward with evidence sufficient at least to balance the scales and restore the equilibrium of evidence touching the validity of the will."

■ Under the circumstances here existing, it was incumbent upon respondent to show that Alex Jaaska knew and understood the contents of the document he signed on May 8th. *In re Beck's Estate,* 79 Wash. 331, 140 Pac. 340; *In re Tresidder's Estate,* 70 Wash. 15, 125 Pac. 1034. This they attempted to do by stating that he required no assistance in understanding it and by reiterating again and again that, after reading the will, he said it was made just the way he wanted it made. The story that the witnesses Alex H. Jaaska and Jake O. Salo told was flatly contradicted by one of the subscribing witnesses, and is incredible in the light of all the testimony concerning the decedent's physical condition and his limited knowledge of English.

The respondent failed completely to rebut the presumption of fraud and undue influence. In fact, the testimony of both Alex H. Jaaska and Jake O. Salo was so inherently improbable as to leave the appellant's case stronger when respondent rested than when he began. The witness Salo, though loquacious, was evasive and what is known in

the vernacular as "smart alecky." He was impeached and thoroughly discredited.

The judgment of dismissal is reversed, and the superior court of Thurston county is instructed to enter an order annulling and revoking the probate of the will of Alex Jaaska, deceased, heretofore admitted to probate by that court on the sixteenth day of July, 1945.

MALLERY, C. J., STEINERT, ROBINSON, and JEFFERS, JJ., concur.

May 2, 1947. Petition for rehearing denied.