The determinative question in this case is one of fact to be gathered from the evidence and legitimate inferences therefrom. That question is whether a certain paper purporting to be the last will and testament of Austin C. Bartles, deceased, who died April 19th, 1938, was properly admitted to probate by the Orphans Court of Hunterdon county. Probate was resisted by caveators as the product of undue influence. The Orphans Court, after a hotly contested trial, while conceding that there was a strong presumption of undue influence arising out of circumstances attending the execution of the paper (and perhaps certain later occurrences to be considered presently), delivered an opinion holding that the presumption had been overcome, and accordingly ordered the will admitted to probate. On appeal to the Prerogative Court the decree of the Orphans Court was affirmed in a lengthy and carefully considered, *Page 473 
but unreported, opinion by Vice-Ordinary Buchanan likewise recognizing the presumption and likewise holding that on the evidence that presumption had been overcome. This decision is before us on the present appeal.
The deceased was eighty-two years old, a resident of Flemington, who had never married. The paper was executed on January 12th, 1938, and Mr. Bartles died, as has been said, on April 19th of that year. His previous adviser for many years had been Willard C. Parker, a lawyer of Flemington, who had died in 1933; and so far as gathered from the evidence, Mr. Bartles had not needed the services of counsel since the death of Mr. Parker until he desired to make a will. The paper under consideration was drawn by Ryman Herr, a member of the bar residing and doing business in Flemington, and a neighbor of the deceased, but he had never previously attended to any legal matter for him. Herr, according to his testimony, was called by Bartles to draw his will, went to the Bartles house and conferred with him, made certain pencil notes of proposed testamentary dispositions (which notes are in evidence in the case), took those notes to his office, dictated the draft of a will to one of his stenographers, and after it had been typewritten, repaired to the home of Bartles with two young women clerks employed in Herr's office to act as witnesses; and after one or two corrections in the paper, which seem to have been made by the testator himself in his own handwriting, Mr. Herr presided over the execution of the instrument by the testator and over the subscriptions by the witnesses. All of this, of course, was perfectly regular as a matter of procedure. The difficulty in the case arises principally out of the fact that Mr. Herr was named in the paper as executor, he was legatee in the amount of $5,000; and he was further named as a contingent sharer in the residuary estate in case the original bequest of the residue for charitable purposes should fail to become operative under certain somewhat complicated restrictions imposed by the will. The judge of the Orphans Court said in his opinion, and we think correctly, that "under this statement of facts, it is clear that a presumption of undue influence has been raised, and that the burden of overcoming *Page 474 
the presumption and proving that the will was a spontaneous act of the testator was thrown upon Mr. Herr, testator's attorney and confidential adviser" (citing In re Cooper's Will, 75 N.J. Eq. 177).
The case was bitterly contested in the Orphans Court, in the Prerogative Court, and in this court. To the circumstances of the parties and of the execution of the paper before the death of Mr. Bartles, there was added not only evidence of certain conduct of Mr. Herr subsequent to the execution of the will and after the death of the testator, but also of matters occurring in the course of the litigation. These will be considered later on.
The paper, which for convenience will herein be called the "will," directs (1) payment of debts, c.; (2) bequests to cemeteries for the care and preservation of cemetery lots; (3) defeasance of the above under certain circumstances; (4) some ten money legacies as follows:
(a) To a Dr. Gibbs, $5,000; (b) to a Dr. Thomas, attending physician, $5,000; (c) to the widow of Mr. Willard Parker, $3,000; (d) to a first cousin named Bonnell, $2,000; (e) to a first cousin named Shurts, $1,000; (f) to Dr. Hawke of Flemington, $5,000; (g) to an aunt, Mrs. Clark, $1,000; (h) to a Marguerite Hoffman, $4,000; (i) to the Presbyterian Church of Flemington, $4,000 as an endowment fund; and (j) to Ryman Herr, who drew the will, $5,000. It may be noted at this point that the testator left only two first cousins, to each of whom he left a legacy, and that there were seven second cousins, six of whom objected to the probate of the paper, but all of whom were omitted.
Recurring to the terms of the will, paragraph 5 contains the residuary disposition and contemplates the use of the residue as a trust fund to be offered to the borough of Flemington; but if the borough should not accept, then to the county of Hunterdon, for the purposes of helping in the erection of a local hospital on certain terms, and in case the scheme breaks down, the residue is to be divided pro rata among the named legatees except some of them as shall have received trust funds. This residuary provision is the principal, though not the sole point of attack; and the grounds of attack are substantially two: first, that no such contemplated *Page 475 
scheme was indicated in the pencil note made by Mr. Herr at the time of conferring with the testator, but the note contains only the following clause: "If I own house at time of death to hospital and undistributed assets to help same."
The second point of attack is that the testamentary scheme as regards the residue was entirely too complicated for Mr. Bartles to have framed himself and was consequently the product of the mind of the draftsman and, as argued, was purposely drawn in such form as to be in all likelihood impossible of execution, so that any residue of the estate which would have gone for hospital purposes if the provision were carried out would necessarily have to be distributed pro rata among the legatees in accordance with the clause just mentioned above.
Certain conduct of Mr. Herr in connection with apparent failure to notify the relatives of the testator's death and the purport of the will in time for them to caveat against the granting of probate, and with regard to letters to several parties suggesting that Mr. Herr's partner would acknowledge service of citation for them, as well as the handling of the case in the Orphans Court, and particularly Mr. Herr's behavior therein as a witness, are called in question by the appellants and will be adverted to in due course.
One point seems to stand out prominently in the case and we think it should be carefully borne in mind; and that consists of the facts, undenied, with reference to the custody and control of the paper itself up to the time of testator's death. The paper, as we have said, was signed and witnessed on the 12th of January, 1938, after two corrections by the testator in his own handwriting. It was drawn in typewriter and there was a typewriter copy. According to Mr. Herr's testimony, which is unimpeached in this regard, the will and copy were left with the testator until two or three days before he died. Mr. Herr's testimony is that on the Saturday before the death of testator he, Mr. Herr, considered it advisable that the will should be lodged in a safe place and that accordingly he went to the house of the testator, learned that the will was locked up in testator's desk, obtained from the nurse the key of the desk, opened the desk and took the will out of it, went to his office and had another copy made, sealed *Page 476 
the copy in a brown envelope, leaving the will envelope intact, and took it down and left it with the Flemington Bank and Trust Company and it remained there. He testified that the bank called him up two or three times reminding him that he had left an envelope there, and that he went down one day, and in the presence of the cashier and of Mr. Sutphin, took the will out and had them read it. Neither the cashier nor Mr. Sutphin was sworn as a witness, but there is no reason to doubt but that both would have been available as witnesses if desired. We have, therefore, the situation, not uncommon, of a will after execution being left in the custody and control of the testator himself and remaining in that custody and control for over three months undestroyed and unaltered, giving rise to the well settled presumption that testator was fully acquainted with its contents; and naturally it would have been the simplest thing in the world for testator to destroy it if he was not satisfied with it. Taken by itself, this situation seems to fall clearly within such decisions as Brick
v. Brick, 44 N.J. Eq. 282; McLaughlin's Case, 69 N.J. Eq. 479;
and the leading and oft-cited Cooper Will Case, supra; affirmed,76 N.J. Eq. 614; sub nom. Harrison v. Axtell.
We may now proceed to consider the other circumstances already alluded to above. For the most part they relate to the conduct of Mr. Herr out of the presence of the testator and both before and after his death. The first occurrence to be considered, however, does not relate to this period, but to the actual drawing and execution of the will and relates to the clause designating the pecuniary legatees as substituted takers in case of the breakdown of the hospital project. It is pointed out, and correctly, that the pencil note contains no such complicated provision as that which appears in the will itself, but we think that this could hardly be expected to appear in the pencil note. The testimony of Mr. Herr on that point was in substance that there was quite a discussion between the testator and himself with regard to the plan, both on direct and cross. On direct he said, after some discussion about the Presbyterian Church, that "if he had enough money for a hospital he would like to have a hospital, and I suppose we talked ten or fifteen minutes or maybe *Page 477 
longer about a hospital. Q. Different ways in which his money could be supplemented to make a hospital possible? A. That is right. Q. And the conclusion reached by Mr. Bartles with reference to the residue of the estate is as it appears in the last will and testament? A. That is correct." On cross he was asked: "Q. If I understood you correctly on your direct examination all parts of item fifth of the will providing for a hospital bequest are the thought and plan of the testator himself, only the words in which the ideas are set out are yours. Is that correct? A. That is correct." The provision as stated in the will was, of course, placed before the testator at the time it was executed and was subject to his inspection, supervision, consideration and correction at any time between the execution of the will and his death.
Next, we have the minor point that the stenographer who typed the will was not present when he read it to Mr. Bartles just before it was executed, but that she was sitting in a car outside the house. We fail to see the importance of this point except as a minor circumstance which might appear to be taken into account with other more important ones as part of an argument that the will was the product of undue influence. Standing by itself, it seems to have no particular effect.
The next point to be noted is the failure of Mr. Herr to notify the relatives of testator that he was dangerously ill. We are quite unable to see what duty was imposed upon Mr. Herr as draftsman of the will to notify expectant relatives.
The next point is that Mr. Herr did not do anything about notifying the borough by presenting to the borough authorities a copy of the will until two months after testator's death; nor to the freeholders until about a month later. Mr. Herr may have been delinquent in the performance of his duty as executor by failing to do so, but we think it cannot fairly be said that that delinquency is an important piece of evidence to show undue influence in the execution of the will.
Another point made is the conduct of Mr. Herr in having certain next of kin represented in a formal way by his partner for the purpose of acknowledging service of the citation. This, of course, was an unusual thing to do and probably open to criticism from the standpoint of legal ethics, but it is to be noted that some, or all, of these next of kin were represented *Page 478 
by counsel who normally would be quite capable of seeing that their interests were not prejudiced by any such action. When the case was called for trial and the time came for proving the execution of the will, Mr. Herr did not take the stand and finally did so under some compulsion, taking the position that no presumption of undue influence arose from the facts that he had drawn the will and attended to its execution, although himself an important beneficiary and an executor thereunder. A reading of the opinion of Judge Prall in the Orphans Court and of Vice-Ordinary Buchanan in the Prerogative Court will show quite clearly that there was a great deal of bad blood between counsel and that in the course of the hearing the proceedings were, to say the least, most undignified in character. We concur entirely in the view of the Vice-Ordinary on this point as expressed in his opinion which we take the liberty of quoting. "This court is satisfied that the unfortunate attitude displayed by proponents during the trial, and doubtless most of the other unwise acts referred to, were actuated by what obviously was a rather bitter personal antagonism toward counsel for the caveators — which in turn doubtless arose from a feeling that the latter were actuated by a personal antagonism against Mr. Herr, in the filing of the caveats and the efforts made on behalf of the caveators in the prosecution of the trial. In view of the fact that Mr. Herr, under all the circumstances, did occupy a position in which his acts and conduct were properly the subject of full inquiry and investigation, he should have realized this and been the first to offer, and indeed insist upon, the fullest and frankest voluntary disclosure on his part as to all the facts and circumstances within his knowledge or control, and should have been most careful to avoid any and all acts and conduct which might be open to misconstruction." But, again, such conduct cannot be said to have amounted to undue influence.
Still further, appellants cite the failure of proponents to call Dr. Thomas, the attending physician, as a witness to testify to the testamentary capacity of the testator. We have already alluded to the fact that though Mr. Herr went down to the Flemingon bank to get the will that had been left there and gave it to Mr. Weller, the cashier, and Mr. Sutphin *Page 479 
to read, neither of these gentlemen was called as a witness. The failure to call a witness is at certain times and under certain circumstances regarded as an indication that such witness would testify unfavorably to the party refusing to call him, but it does not seem that any such assumption is to be made in the present case. After all, the controversy was one in which it was highly advisable to take the course of calling every one who could contribute relevant testimony on the points at issue. The failure to call all suitable witnesses was not confined to the proponents of the will. It would have been an easy matter for the caveators to call Dr. Thomas who would have been, no doubt, quite impartial, but they did not do so, and it is to be gathered from their brief that the position of the caveators at the trial was in some respects open to the accusation of being an attempt to prevent the probate of the will rather than an effort to ascertain the truth. For example, they say candidly in the brief on the question whether, when Mr. Herr left the will with the testator, it was in a sealed envelope, and whether, when he got it back, it remained sealed in the same envelope without any indication of the seal ever having been broken (we quote from the brief), appellants, "thinking that it was the proponents' duty to volunteer full information in respect to this important point," did not consider it necessary or advisable to supply the deficiencies by cross-examination.
There is also a point in relation to the legacy to Dr. Gibbs. We think it sufficient to say that we have examined the point and consider it without substance.
There may be other minor points which have not been touched upon above but we consider it would make the present opinion unnecessarily prolix to discuss them in detail as we consider them of no material importance.
The decree under review is affirmed.
For affirmance — THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HETFIELD, DEAR, WOLFSKEIL, JJ. 8.
For reversal — PERSKIE, PORTER, RAFFERTY, HAGUE, JJ. 4.
For modification — HEHER, WELLS, JJ. 2. *Page 480