[No. 30311. Department One. March 2, 1948.]

*In the Matter of the Estate of SIMON MARTINSON, Deceased.*[1]

[1]Reported in 190 P. (2d) 96.

*Wright, Booth & Beresford,* for appellants.

*Lenihan & Ivers,* for respondent.

SIMPSON, J.—Simon Martinson, late of King county, died testate March 13, 1945, leaving as his sole heirs at law six brothers and three sisters. At the time of his death, he was sixty-four years of age.

By the terms of his will, executed January 6, 1945, his property was bequeathed to Mrs. Reland Earnest. The validity of the will was contested by all of the brothers and sisters of the deceased. They contended that the will was produced by undue influence exercised over him at, and before, the time of its execution. After a trial to the court, sitting without a jury, the court made its findings of fact and conclusions of law, and, based thereon, entered its judgment dismissing the contest action.

The contestants, on appeal to this court, contend that the trial court committed error in the making and entering its findings, in making its conclusions of law, and in making and entering its judgment dismissing the petitioners' contest of the purported last will and testament. Each assignment of error is predicated upon the question of whether undue influence was exerted upon Simon Martinson by Reland Earnest and those acting with her.

Before referring to the evidence introduced in this case, it seems advisable to set out certain rules of law governing the contest of wills based upon claims of undue influence, which have been adopted by this court.

The right of testamentary disposition of one's property as an incident of ownership, is by law made absolute. It is a valuable right, closely protected by statute and judicial opinion. If a will has been executed with all legal

formalities requisite to the validity of the instrument, and has been admitted to probate, our statute, Rem. Rev. Stat., § 1387 [P.P.C § 218-5], imposes upon those who contest its legal force, the burden of proving invalidity by evidence that is clear, cogent, and convincing. *In re Geissler's Estate,* 104 Wash. 452, 177 Pac. 330; *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682; *In re Johanson's Estate,* 178 Wash. 628, 35 P. (2d) 52; *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47; *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331; *In re Schafer's Estate,* 8 Wn. (2d) 517, ·113 P. (2d) 41; *In re Miller's Estate,* 10 Wn. (2d) 258, 116 P. (2d) 526; and *In re Bottger's Estate,* 14 Wn. (2d) 676, 129 P. (2d) 518.

▪ In order to have a will set aside on the grounds that its execution was produced by undue influence, it must be shown that the influence exerted was such as overcame the will of the testator. To put it in other words, the influence must have destroyed the free will of the testator so that the will spoke the intent and desire of the one exerting the influence, and not the intent and desire of the testator. *Roe v. Duty,* 115 Wash. 313, 197 Pac. 47; *In re Seattle's Estate,* 138 Wash. 656, 244 Pac. 964; and *In re Riley's Estate,* 163 Wash. 119, 300 Pac. 159.

Legal definitions of the term "undue influence" cannot be given that will serve as a safe and reliable test for every case. Each case depends to a very large extent upon the facts presented to the court. However, not every influence exerted over a person can be denominated undue influence. Generally speaking, influence exerted by means of advice, arguments, persuasions, solicitations, suggestions, or entreaties, is not undue influence, unless it be so importunate, persistent, or coercive, or otherwise so operates as to subdue and subordinate the will of the testator and take away his freedom of action. *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515; *In re Tresidder's Estate,* 70 Wash. 15, 125 Pac. 1034; *In re Adams' Estate,* 120 Wash. 189, 206 Pac. 947; *In re Zelinsky's Estate,* 130 Wash. 165, 227 Pac. 507; and *In re Bottger's Estate, supra.*

▪ From the very nature of cases of undue influence, the evidence is mainly circumstantial, so that a liberal scope

of investigation is allowable. Undue influence is not usually exercised openly in the presence of others so that it can be directly proved, but the circumstances relied upon to show it must be such as will, if taken together, point unmistakably and convincingly to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter and not the former. *In re Tresidder's Estate, supra.* While, as stated in the cited case, there is no uniform rule capable of application apart from the facts of each case, yet courts must in each case apply the general rules which appear in the cases just cited.

The evidence is voluminous, and we do not feel it necessary to discuss it in detail, but will only refer to those portions which counsel for the respective parties insist control the disposition in this case.

Martinson was a man of limited education. Just prior to the death of his wife, September 15, 1934, his sister-in-law, Ida M. Anderson, came from Minnesota to be with her sister. After the death of Mrs. Martinson, Mrs. Anderson remained in Seattle and kept house for her brother-in-law until she suffered an automobile accident and was sent to a hospital. While in the hospital, she met Reland Earnest, who, through Mrs. Anderson, met Mr. Martinson. Reland Earnest was married at the time. Thereafter, Mr. Martinson visited Mr. and Mrs. Earnest at their home, and on several occasions remained there overnight.

The evidence of the contestants tended to prove the following facts: Shortly after his contact with Mrs. Earnest, Mr. Martinson commenced drinking to excess. He discontinued his contacts with friends of many years, and also ceased visiting his brothers and sisters. Mr. Martinson expressed the wish that he could rid himself of Mrs. Earnest. He was very fond of his home, but, under the influence of Mrs. Earnest, moved to her home, where they lived together as husband and wife.

January 6, 1945, Mrs. Earnest called Robert Anderson, who had been the attorney for Mr. Martinson at the time his wife's estate was probated, and asked him to draw a will for Mr. Martinson, leaving all of his property to her. Mr.

Anderson prepared the will as requested and took it to Mr. Martinson at Mrs. Earnest's home. Present in the bedroom where the will was signed, was Mrs. Earnest, and her daughter, Reland Michael. Mr. Anderson asked Mr. Martinson if he desired to make the will and received an affirmative answer. The situation is best presented by the testimony of Mr. Anderson:

"A. And then Mr. Martinson did not seem to understand it, or hesitated, and so Mrs. Earnest made the statement to him in effect, 'This is what we have considered', or something like that; that it was giving her his property, which she understood he was to do, and then I went into it a little more definitely and explained each of the terms of the will to him, and asked him whether he wanted Mrs. Reland Earnest appointed executrix of it, and he indicated he did, and I told him this was giving all of his property to Mrs. Earnest and that it was a non-intervention will and she was to act without bonds. That was the substance of what I told him. And I asked him if he wanted to make that will. I think he said 'Yes', or indicated he did.

"Q. Did he read the will? A. He did not read the will himself. Q. I think you have said that Mrs. Earnest was present there in the room all the time? A. Yes. Q. Is there anything that is contained in that will— A. Just a minute, Counsel. I think I read it to him again after these words were added. I read it to him a couple of times. Q. You say at first he was hesitant about signing? A. He was hesitant. I don't know why. Apparently, from the looks of him, he was a little puzzled. Q. Did that hesitancy exist before you inserted this provision in longhand, or was that afterwards? A. That was afterwards. Q. That he was still hesitant. Did you say she said something to him? A. She said, 'This will provides according to our understanding'—I think those were the words that were used— 'That you were to give all your property to me—will all of your property to me.' Q. Who was in the room? A. Reland Earnest and her daughter and myself. Q. And Mr. Martinson? A. Surely; Mr. Martinson. Q. Is there any provision in this will or any provision contained in it that you placed therein at his direction? A. No. Q. You witnessed the will? A. Yes, sir. Q. Who was the other witness? A. Reland Michael. Q. She was the daughter of Mrs. Earnest? A. Yes, sir."

. Mr. Martinson was taken to the hospital the day the will was executed. While there, his brother, P. A. Martinson, attempted to visit him but was not allowed to do so except in the presence of Mrs. Earnest. The brother suggested that Mr. Martinson go to the home of his sister in Bellingham, but Mrs. Earnest said, "That is out. He is sick. He can't go no place."

None of his relatives succeeded in seeing Mr. Martinson without Mrs. Earnest being present. One witness, Mrs. Florence C. Wunsch, who testified by deposition, lived at one time in the same house with Mrs. Earnest. Her evidence showed that Mr. Martinson and Mrs. Earnest occupied the same bedroom for some time. Mrs. Earnest explained that she and Mr. Martinson had been secretly married. Mr. Martinson obeyed any suggestion made by Mrs. Earnest. Several time Mrs. Earnest told Mr. Martinson that he should make a will. The witness stated:

"Well, they would tell him practically the same thing. Joe Michael would walk up and down the front of his bed and say, 'You better take care of it, you never know, you never know, with your condition, it is better to have a will made out.' And they kept on practically that way, the same amount of words,—and maybe he would walk out of the room and back in again and maybe the daughter would say something. And Mrs. Earnest would say, 'Maybe you can do something with him. I can't do nothing with the dumb Norwegian.'"

She described another scene as follows:

"A. He [Martinson] was sitting on the edge of the bed, about the middle of the bed there, like that. Q. Where were the other people? A. In the room, Joe Michael was standing opposite the dresser, and the daughter was on the side of the room by the door, and as I said, I saw Sam,—I figured he was having a heart attack, and he kept saying like that,—like that, 'Leave me alone, leave me alone,' he said, 'Get me out of this.' He said, 'Leave me alone.' He said, 'I will do anything, just leave me alone.' He said, 'I will sign anything.' Q. Where was Mrs. Earnest standing? A. Sitting in the big chair in the room."

Opposed to the evidence just related, was that given on the part of the proponents of the will. In 1939, Sam Martin-

son's aged father became ill, and thereafter, on Friday evenings, Mrs. Earnest stayed at the Martinson home as a nurse. After that, Mr. Martinson was often times a guest at the Earnest home. Mr. Earnest was an invalid for a long time before his death in March, 1944. The years of friendship between Mr. Martinson and Mrs. Earnest ripened into love, and they became engaged to be married. Several witnesses testified that on many occasions Mr. Martinson stated that he and Mrs. Earnest were to be married. Mrs. Earnest told some of the witnesses that she would marry Mr. Martinson as soon as a year had expired after Mr. Earnest's death.

In the latter part of 1944, Mr. Martinson had several severe heart attacks. A very serious attack occurred January 5, 1945. The next day he was taken to a hospital. Before that time, however, he determined to make a will, and asked Mrs. Reland Michael to telephone Mr. Robert Anderson and request that he draw a will and bring it to the house for execution. He remained at the hospital until January 22nd, at which time he, at his own request, returned to the home of Mrs. Earnest. Thereafter, Mrs. Earnest nursed him. When Mr. Martinson was taken to the hospital, Mrs. Earnest notified his brother Peter, who in turn notified the other relatives. Only three of his brothers visited him at the hospital. Mr. Martinson was described as a set man, with very determined opinions. During his last illness, and subsequent to the making of the will, his brother R. W. Martinson, his sister Mrs. Rena Mehus, and several friends visited him.

Several witnesses contradicted the evidence given by Mrs. Wunsch. Mrs. Earnest emphatically denied any improper relations with Mr. Martinson. She said that after his return from the hospital his condition was such that she moved into his room in order to properly care for him as his nurse. She occupied a bed separated from Martinson by a partition of drawers and a curtain. Other evidence introduced at the trial proved that Mr. Martinson was never at any time addicted to the use of intoxicating liquors.

Based upon the evidence just related, the trial court concluded that no undue influence had been practiced upon Mr.

Martinson at the time he made his will. His conclusions are best expressed in his well-considered memorandum opinion.

"We have a man who, though reserved and somewhat deliberate in speech, was up to the time of death at all times mentally alert. The contention that in the later years of his life he was addicted to the use of intoxicating liquor is not, in my opinion, established by clear, cogent and convincing evidence. On the contrary, it is established by a preponderance of the evidence that his use of intoxicants was extremely moderate throughout his entire life.

"Nor is the contention that his affections for his brothers and sisters were alienated by the respondent, sustained by the evidence. While the evidence discloses that visits between the decedent and his brothers and sisters were less frequent during the later years, the disruption in such visits was largely due to the contestants rather than the decedent or the respondent herein. . . .

"The contention that an illicit relationship existed between the decedent and the respondent herein, in my opinion, is not sustained by the evidence. Such contention, in my opinion, is based upon suspicion rather than upon concrete or substantial direct or circumstantial evidence. The character and reputation of a mother of two grown children should not be marred or destroyed upon mere suspicion, especially where her neighbors and friends, as in the case at bar, testify as to her good qualities, habits and morality.

"The evidence discloses that the decedent met the respondent in 1938 or 1939, while she was a patient in a Seattle hospital. A friendship was formed between the decedent and the respondent and her then husband (the latter being crippled by a paralytic stroke.) This friendship continued until the death of the respondent's husband in April, 1944. Subsequently, the decedent became a roomer and boarder in respondent's home. Her testimony that decedent and respondent thereafter became engaged and planned to marry is corroborated by both direct and circumstantial evidence herein. The marriage, at the request of her son, was deferred until a year had elapsed after the death of respondent's husband. Before such year had elapsed, decedent contracted the serious heart ailment which culminated in his death. The will here in question was prepared during such illness, just prior to the going of decedent to the hospital, by a capable, conscientious, experienced mem-

ber of the Seattle Bar. Such lawyer testified herein that decedent at the time was in full possession of his faculties and not suffering any undue influence. Decedent was discharged from the hospital within two or three weeks, and returned to respondent's home. He died six weeks or two months thereafter during a subsequent heart attack. . . .

"In the final analysis, it seems to me that the fact that the decedent failed to revoke or change his will after he was discharged from the hospital, although he lived several weeks thereafter during which he was in full possession of his mental faculties, refutes the contention that he was unduly influenced at the time such will was executed."

■ The evidence produced in the instant case is not sufficient to overcome the findings, conclusions, and judgment of the trial court. The trial court saw and listened to the testimony of many witnesses through a long and well-presented case, and decided in favor of the proponents of the will upon conflicting evidence.

A trial judge is much more than a commissioner named to take and collect evidence in a case. He is a judicial officer provided for by our constitution, and the laws of this state. He has had years of experience as a trial lawyer, and as a judge. He is a student of human beings who come to testify on the witness stand and give their stories. He had the opportunity, and it was his duty, to study the witnesses. In determining the credibility of the various witnesses, and the weight to be given to their testimony, he took into consideration their conduct and demeanor while testifying, their temper, feeling of bias, if any, their fairness, or lack of fairness, their conduct and appearance while on the witness stand, and while in the courtroom, the reasonableness, or unreasonableness of the story they told, their opportunity, or lack of opportunity, of knowing that about which they testified, the apparent capacity and intelligence of the respective witnesses, and their capability to correctly observe and report the matters testified to by them. He gave such credit and weight to the testimony of each witness, which, under all the circumstances, he deemed that witness, and his, or her testimony, was entitled to receive. The credibility of the witnesses, and the force of their testimony, and

the weight that should be attached to it, are all matters concerning which the trial judge is the best judge.

As has been stated in many of our opinions, the trial judge has the opportunity to test the credit and weigh the evidence of the various witnesses which is denied to us who read no more than the words on the typewritten pages of the statement of facts. Realizing, however, that this case is tried *de novo* in this court, we have given careful consideration to the evidence contained in the statement of facts. From that study, we conclude that no undue influence caused Mr. Martinson to leave his estate to Mrs. Earnest. We are of the opinion that he made his will with the deliberate intent of remembering the woman he loved and hoped to make his wife.

The judgment is affirmed.

MALLERY, C. J., MILLARD, SCHWELLENBACH, and HILL, JJ., concur.

