[Nos. 37936, 38020.   En Banc.   March 3, 1966.]

*In the Matter of the Estate of* GUY L. SMITH, *Deceased.**

*Reported in 411 P.2d 879, 416 P.2d 124.

*Casey & Pruzan,* by *Carl Pruzan, Mont Clair Spear,* and *Walthew, Warner & Keefe,* by *John F. Walthew,* for proponents.

*Sherwood, Tugman & Green,* by *William M. Tugman* and *Helsell, Paul, Fetterman, Todd & Hokanson,* by *Richard S. White,* for contestants and intervenor.

WEAVER, J.—This is an action contesting the September 22, 1961 will and the January 30, 1962 codicil of Guy L. Smith, who died May 20, 1963, 16 days before his 80th birthday.

Some 20 individuals are involved. Insofar as we need classify the parties, we designate them (1) contestants, (2) intervenor, and (3) proponents.

The contestants are decedent's sister, two nieces and a grandniece. Under the will they were to receive $18,000 each, but this sum was reduced to $10,000 each by the codicil. Virginia Burnside, a niece of Smith's deceased wife, is the intervenor. Although a named legatee in the prior will of decedent (1960 will), she does not share under the present will and codicil. Her two sons, however, Robert and Gregory, are bequeathed $5,000 each. By virtue of a post-trial agreement, the position of contestants and intervenor is identical on appeal.[1]

Proponents of the will and codicil fall into two classes: (1) a brother-in-law and his wife who receive $8,000; eight friends who receive a total of $9,000; Della Canning (Zieske), a friend who is bequeathed $43,000 (specific bequests to all parties total $120,000); and (2) Lewie Williams, testator's lawyer, and executor, who is to receive 80 per cent of the remainder, and Marie Sharp Afflerbaugh, Williams' secretary since 1951, who is to receive 20 per cent of the remainder.

The decree of the trial court held void that portion of decedent's will and codicil which conferred any benefit upon Lewie Williams (except his appointment as executor) and Marie Sharp Afflerbaugh "by reason of the undue influence of the said Lewie Williams and Marie Sharp Afflerbaugh." The court otherwise confirmed as valid all other provisions of the will and codicil.

Proponents, Lewie Williams and Marie Sharp Afflerbaugh, appeal from the decree canceling their remainder; Williams cross-appeals from an "Order Allowing Executor Certain Expenses." Contestants and intervenor appeal, urging that the will and codicil should be invalidated in their entirety and no expenses allowed the executor. Were it not for the post-trial agreement between them, this unity of purpose would not exist. There is no appeal by those

[1]The position on appeal of decedent's sister-in-law, Bess Huddleston, is not clear from the record. She receives $18,000 under the will, reduced to $10,000 by the codicil. She signed the post-trial agreement to accept $10,000.

we have designated as the first category of proponents; the trial court's decree does not disturb their bequest. Della Canning (Zieske) has, however, appeared as a respondent urging either that the will and codicil be upheld or that the court correctly applied the doctrine of partial invalidity of wills. Either theory would validate her $43,000 bequest. She is not a party to the post-trial agreement for distribution of the estate.

The trial consumed 5 days; it left few stones unturned. Thirty-four witnesses testified, six by deposition. The size of the appellate record[2] is commensurate with the value[3] of the estate involved.

Guy L. Smith (decedent) and Lewie Williams were close personal friends, classmates, and members of the same college fraternity at the University of Washington in 1906. Mrs. Williams and Mr. Smith, both pharmacy students, were well acquainted in college.

Smith and Lenna Elzey were married in 1914. They moved to Alaska where they owned and operated drug stores. The size of their estates indicates that they were eminently successful. They moved to Seattle in 1944 where they continued their longstanding friendship with the Williamses.

In 1944 the Smiths executed a community property agreement. In 1958 they executed wills confirming the community property agreement and providing that in the event of simultaneous deaths their property should pass one-half to certain designated relatives of Mr. Smith and one-half to certain designated relatives of Mrs. Smith. In 1960, the Smiths executed new wills naming each other as principal beneficiary and designated relatives of each as contingent beneficiaries. Lewie Williams, who had drafted the wills, was named executor in the 1958 wills and contingent execu-

---

[2]There are 562 printed pages of appellate briefs; 295 pages of transcript; 473 pages in the statement of facts.

[3]Assets of the estate are composed of cash, listed "blue chip" corporate securities and United States Government bonds. Appraised value at date of death: $272,555.84.

tor in the 1960 wills. He was designated in all the wills as "my friend and attorney."

Mrs. Smith died October 4, 1960. Mr. Williams, as attorney, filed the 1944 community property agreement and cleared the estate of inheritance tax liability. The inheritance tax return signed by Mr. Smith on December 30, 1960 discloses an estate valuation of $226,217.66, composed almost entirely of listed corporate stocks.

After the death of Mrs. Smith, Williams and Smith became even closer friends. It would unnecessarily extend this opinion to set forth the details of their personal relationship. It is sufficient to mention that they were constant companions; that they had lunch together at least 4 out of every 5 week days, eating at the same table in the same restaurant, alternating daily on the payment of the luncheon bill; that the switchboard operator in the apartment where Mr. Smith lived testified that she placed calls to Mr. Williams from Mr. Smith every day; that she had instructions to telephone Mr. Williams in case of need; that when Mr. Smith was in the hospital for 5 days in 1961 because of hiccoughs, the admission chart shows: "Name of nearest relative or friend: Lewie Williams."

Mrs. Williams testified:

If he [Smith] didn't have an invitation out for the week-end, we always tried to see him because we didn't want to leave him alone in his apartment, you know, over the week-end. He was lonely.

There is ample evidence in the record to support the trial judge's observation that

there was a great bond of love and friendship between Mr. Williams and the testator.

September 22, 1961, Mr. Smith executed the will now under consideration; January 30, 1962—4 months later—he changed it by codicil as hereafter noted. At trial, counsel stipulated that the will and codicil "were physically prepared and for that purpose or for those purposes, Mr. Williams was acting as the attorney for Guy L. Smith." It was further stipulated that Mrs. Marie Sharp Afflerbaugh, Mr. Williams' legal secretary, typed the will and codicil.

The will made specific bequests of $120,000 of which $108,000 was bequeathed to relatives related to Mr. Smith or to his deceased wife by either blood or marriage; $12,000 was bequeathed to eight friends, one of whom, Della Canning (Zieske), was to receive $3,000.

We believe the wording of many of the specific bequests in the will to be significant. They are set forth in the margin.[4] They are not couched in the jargon of the legal profession but indicate they were dictated by the testator. Further, Mr. Williams testified that on the date of the will he was not acquainted with nine of the named beneficiaries. The language of the bequests discloses that Mr. Smith was a *thoughtful, appreciative,* and *generous person.*

On numerous occasions, Mr. Smith had expressed great affection for Della Canning (Zieske). It is apparent that after making his will he wished to bequeath to her more than $3,000. This he accomplished by the codicil. Specific bequests to five beneficiaries (all relatives) were reduced

---

[4]To Elzey and his wife "in recompense for their consideration and effort in having me out to dinner on various occasions."

To Mabel Combest, a friend, "to represent my thanks to her for having driven me in her car and for the nice dinners she gave me."

To Ellsworth Vachon "for the genuine fraternal spirit he has always shown towards me." (*a 1906 college classmate and fraternity brother*).

To the Wehrens "in recompense for the kindly spirit and sociability they have shown to Lenna and me over the many years."

To Della Canning (Zieske) "for her wonderful spirit of kindness and help to me over a period of many years."

To my friend Beth Burch "for her kindness and friendship during my acute period of grievance over the loss of my beloved wife and also for her expressed friendship for Lenna."

To my friend Anne Wyte, "as a final tribute on the eve of my departure to the great beyond and so she will not forget me, I am willing this sum to take care of the gifts and things I would naturally have brought her myself, so don't cry Anne, my spirit will just be with you."

To my friend Ethel Scatcherd (*wife of a 1906 college classmate and fraternity brother*), "in consideration of her past courtesies and friendship over several years and especially for the wonderful tribute she made about Lenna to me, but not in payment therefor, but as a gift for her to buy new hats or dresses for herself."

To Robert and Gregory Burnside "to insure, if possible, that their great aunt, Lenna Smith, may be represented in their chosen careers."

from $18,000 to $10,000, and $40,000 additional was bequeathed to Della Canning (Zieske).

Not a single lay witness or any of the several doctors testified that Mr. Smith was not legally capable of making a will. He was described as having a very brilliant mind; interested in everything; mentally alert; intelligent; of his own mind and convictions; a very determined person; not easily influenced; competent in the administration of his investments. Even though his eyesight was greatly impaired, he handled his own brokerage account, buying and selling listed corporate securities.

The trial court found that:

At the time of the execution of said will and codicil, Guy L. Smith was active in the daily affairs of life. He had had for many years atherosclerosis and on one occasion had a severe attack of hiccups, for which he was hospitalized from September 3 to September 8, 1961. His eyesight for several years had been failing and at the time of the execution of said will and codicil, Guy L. Smith was unable to read, was practically blind in one eye and partially blind in the other eye, in that he could distinguish light and hand motions and the difference between a $5.00 and $10.00 bill. Guy L. Smith required assistance from some person present to find the places where to affix his name and initials to the will and codicil. Lewie Williams was present in the office of Dr. Jones when the will of September 22, 1961 was signed. (Finding of Fact VII).

At the time of executing said will and codicil in September, 1961, and January, 1962, respectively, and at all times between the execution of said documents, the testator, for a man of his age, education and training, *was capable of understanding the objects of his bounty, was capable of understanding the general nature and extent of his estate, and was capable of understanding that the documents he was signing were his will and codicil.* The will and codicil aforesaid were executed by the testator in the presence of witnesses. (Italics ours.) (Finding of Fact VIII)

It is beyond dispute that Guy L. Smith had testamentary capacity. Further, fraud is not a factor in the instant case.

Although alleged in the pleadings, the evidence does not disclose fraud, nor did the trial court find fraud. Had there been fraud, certainly the trial court would not have continued Lewie Williams as executor of decedent's nonintervention will.

■■■■ We start with the rule announced in *In re Martinson's Estate*, 29 Wn.2d 912, 190 P.2d 96 (1948), that:

> The right of testamentary disposition of one's property as an incident of ownership, is by law made absolute. It is a valuable right, closely protected by statute and judicial opinion. If a will has been executed with all legal formalities requisite to the validity of the instrument, and has been admitted to probate, our statute, Rem. Rev. Stat., § 1387 [P.P.C. § 218-5], *imposes upon those who contest its legal force, the burden of proving invalidity by evidence that is clear, cogent, and convincing.* [Citing 8 decisions.]
>
> In order to have a will set aside on the grounds that its execution was produced by undue influence, *it must be shown that the influence exerted was such as overcame the will of the testator. To put it in other words, the influence must have destroyed the free will of the testator so that the will spoke the intent and desire of the one exerting the influence, and not the intent and desire of the testator.* [Citing 3 decisions.]
>
> Legal definitions of the term "undue influence" cannot be given that will serve as a safe and reliable test for every case. Each case depends to a very large extent upon the facts presented to the court. *However, not every influence exerted over a person can be denominated undue influence.* Generally speaking, influence exerted by means of advice, arguments, persuasions, solicitations, suggestions, or entreaties, is not undue influence, unless it be so importunate, persistent, or coercive, or otherwise so operates *as to subdue and subordinate the will of the testator and take away his freedom of action.* [Citing 5 decisions.] (Italics ours.)

Mr. Smith's will and codicil were executed with all legal formalities requisite to their validity. The contest casts upon the contestants the burden of proving the invalidity of the will and codicil by evidence that is clear, cogent and convincing.

■ In *Martinson, supra,* the evidence of undue influence seems more cogent than in the instant case, yet the action contesting the will was dismissed. Most of the questions raised by the instant case orbit around a *presumption* of undue influence said to spring from the fiduciary, confidential, attorney-client relationship between Mr. Smith and Mr. Williams.

We set forth, therefore, the scholarly definition and discussion of undue influence written by the late Judge Steinert in *Dean v. Jordan,* 194 Wash. 661, 79 P.2d 331 (1938):

> To vitiate a will there must be something more than mere influence. There must have been an undue influence at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. [Citing 13 decisions.]
>
> The evidence to establish fraud or undue influence must be clear, cogent, and convincing. [Citing 5 decisions.]
>
> Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will. The weight of any of such facts will, of course, vary according to the circumstances of the particular case. Any one of them may, and variously should, appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will.
>
> The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient

to overthrow the will. *In re Beck's Estate,* 79 Wash. 331, 140 Pac. 340.

Considering the matter in the light of these rules, we believe and hold *that the facts in this case did raise a presumption of undue influence, and that the presumption was of such strength as to impose upon the proponent the duty to come forward with evidence sufficient at least to balance the scales and restore the equilibrium of evidence touching the validity of the will.* (Italics ours.) (The petition contesting the will was dismissed.)

The existence of the presumption imposes upon the proponents "the duty to come forward with evidence sufficient at least *to balance the scales and restore the equilibrium of evidence touching the validity of the will*"; it does not, however, relieve the contestants from the duty of establishing their contention by clear, cogent, and convincing evidence.

In three opinions of this court (*In re Tresidder's Estate,* 70 Wash. 15, 125 Pac. 1034 (1912); *In re Jaaska's Estate,* 27 Wn.2d 433, 178 P.2d 321 (1947); *In re Ganjian's Estate,* 55 Wn.2d 360, 347 P.2d 891 (1959)), wills were held void because of a presumption of undue influence. In all three decisions, (a) the testator had little or no mental capacity; (b) the testator was greatly impaired physically; (c) the testator disinherited one near and dear to him; and (d) the estate or a major portion thereof, was devised or bequeathed to one with whom the testator had no close ties.

A careful analysis of the record before us establishes none of these factors. Mr. Smith had full mental capacity when he made his will. He was not impaired physically except for his eyesight. He was not only capable of understanding, but did understand, the objects of his bounty, as illustrated by his will and codicil, in which he remembered his and his wife's relatives in amounts which are not inconsiderable. He was capable of understanding, and the evidence discloses that he did understand, the general nature and extent of his estate. He knew the estate was valued at $226,217.66 when his wife died. He dealt

with his stockbroker thereafter; he could not help knowing that the market had advanced between the death of his wife and the date of his will. Mr. Smith disinherited no one unless we can say, as a matter of law, that he did not leave his relatives and his wife's relatives *enough* of his estate. The legacies were substantial; we do not rewrite wills for testators based upon what relatives think they should have received.

Was an *unnaturally* large portion of the estate bequeathed to persons with whom testator had no close ties?

Mr. Smith knew the nature and value of the estate when, on December 30, 1960, he settled the inheritance tax on his wife's estate. To say that he did not know the value of his estate when he made his will September 22, 1961 is unrealistic. The stock market had advanced. Meticulously he had bequeathed $120,000 to specific legatees. The gross remainder was a simple matter of subtraction. From the remainder (the value of which must be viewed as of the date of the will, not the date of death) must be subtracted debts, cost of last illness, funeral expenses, and cost of administration. The value of the estate might have declined as well as advanced—depending upon the stock market, but the $120,000 of specific legacies remained secure.

The rationale of the trial court's decision is this: the fiduciary, confidential, attorney-client relationship between Mr. Smith and Mr. Williams (who was bequeathed 80 per cent of the remainder) raises a presumption of undue influence; the amount given to Mr. Williams is too large; hence, it is unnatural and it is void.

The trial court said in its memorandum opinion:

a gift of some proportion would not be unnatural to Mr. Williams, or, in fact, even in some respects to the secretary, who I am sure, judging from her appearance and demeanor on the stand, was kindly, helpful and interested in this, at that time, old man. So therefore there is some positive evidence that a gift in some proportion is not unnatural and therefore the unnaturalness of this large amount, so to speak, is somewhat reduced, *but I cannot accept that it is natural in such large amount.* (Italics ours.)

This was translated into Finding of Fact 10 in which the court found

the bequest to Lewie Williams of the size as provided in said will and codicil was unnatural in that it constituted an unusually large proportion of the estate.

In *In re Miller's Estate,* 10 Wn.2d 258, 116 P.2d 526 (1941), the court said:

A will is unnatural *when it is contrary to what the testator, from his known views, feelings, and intentions would have been expected to make.* If the will is in accordance with such views, it is not unnatural however much it may differ from ordinary actions of men in similar circumstances. (Italics ours.)

In *In re Hansen's Estate,* 66 Wn.2d 166, 401 P.2d 866 (1965), (decided 5 days prior to argument in this court of the instant case) an 82-year-old testator made a will on July 2, 1962 (revoking previous wills) leaving his property to a neighbor lady who had been engaged the previous day to keep house and care for him pending his moving into a nursing home. In his oral decision, the trial judge said, *inter alia:*

We are not here to test whether he [testator] did something foolish or not. We are here to test whether he wanted to do it and knew what he wanted to do.

Were the relationship between Mr. Smith and Mr. Williams purely a professional one, we would probably not disagree with the trial court's conclusion. It would be difficult to read the voluminous record of the instant case without coming to the conclusion that the canopy enveloping that relationship was love, affection, companionship, and a deep and abiding friendship extending over at least 57 years. It is only secondary that Mr. Williams was a lawyer and drafted the will. There is no evidence that he "procured" either the will or the codicil; he simply prepared them. The trial court remarked that Mr. Williams did "not knowingly or intentionally promote his own interests." We find nothing unnatural in decedent's bequest to his nearest and dearest friend of many years.

In the best tradition of competent advocacy, counsel have urged a series of "suspicious circumstances" supporting their contention of undue influence. Again, it would unnecessarily extend this opinion to discuss each and every suspicion urged by contestants and intervenor. We have considered all of them and have concluded that they are not controlling.

In *Hansen, supra,* the court said:

Mere suspicion, even when accompanied by opportunity and motive, is insufficient to raise a substantial inference of undue influence. *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515 (1912); *In re Bradley's Estate,* 187 Wash. 221, 59 P.2d 1129 (1936). Neither will mere suspicion, unaccompanied by evidentially supported implicating circumstances, give rise to a presumption of undue influence sufficient in strength to require rebuttal evidence.

We find nothing in the record to indicate that Marie Sharp Afflerbaugh did anything, other than type the will and codicil. We find nothing even suggesting that she duly or unduly influenced Mr. Smith.

In the final analysis, the record supports the following: the testator was competent to make a will and codicil; he understood the objects of his bounty; he understood the nature and extent of his estate; he understood the import of his will and codicil. The proponents of the will have come forward with evidence sufficient at least to balance the scales and restore the equilibrium of evidence touching the validity of the will and codicil. The contestants have not met the burden of proving undue influence by clear, cogent and convincing evidence. We feel that the 1961 will and the 1962 codicil expressed the true intent of the testator.

That portion of the decree from which this appeal is prosecuted and which voids the interests of Lewie Williams and of Marie Sharp Afflerbaugh in the will and codicil of Guy L. Smith is reversed.

In view of our conclusion that the will and codicil are valid, the expenses of the executor will be paid out of the residuary estate and not from the specific legacies be-

queathed to the contestants and other legatees. We need, not, therefore, examine the order allowing the executor only 20 per cent of the expenses of the will contest.

The executor and the proponents of the will shall receive their costs on appeal.

HILL, DONWORTH, FINLEY, OTT, HUNTER, and HAMILTON, JJ., concur.

ROSELLINI, C. J. (dissenting)—I would affirm the trial court in its decision in these actions. That decision was based upon a finding that a presumption of undue influence on the part of Lewie Williams, participated in by his secretary, Marie Afflerbaugh, was not rebutted by the proponents of the will. In finding that such a presumption was raised, the trial court took into account the following factors:

(a) the age and physical condition of the testator;
(b) the extremely close fiduciary and confidential relationship existing between the testator and Lewie Williams and between the testator and Marie Afflerbaugh;
(c) the opportunity on the part of said persons to exercise undue influence;
(d) the participation and assistance of Lewie Williams in the procuring and making of the will and the making of the codicil;
(e) the unnaturally large proportion of the estate received by Lewie Williams and Marie Afflerbaugh;[5]
(f) Mr. Williams' knowledge of the size and value of decedent's estate;
(g) lack of independent advice;
(h) the testator's lack of knowledge and understanding of the effect of paragraph 19 of his last will and testament.

There are findings of fact which, to my mind, are significant, but which are not contained in the majority opinion. The trial court found, for example, that in the preparation of the will and codicil, Mr. Lewie Williams acted as attorney for Guy L. Smith. The witnesses for the will of

---

[5] Specific bequests totaled $120,000. The residue of the estate, bequeathed to the lawyer and his secretary, exceeded $150,000 in value.

September 22, 1961, were procured by and through the office of Lewie Williams. Lewie Williams retained custody of these instruments from the time of their execution until they were filed herein for probate.

The court also found that Lewie Williams and Marie Sharp Afflerbaugh had a good opportunity to exercise undue influence over Guy L. Smith inasmuch as Mr. Smith turned over the management of his business affairs to them by degrees from 1961 to nearly complete management in late 1962, and continuing to his death.

Other significant findings were as follows:

At no time mentioned herein, including September 22, 1961 and January 30, 1962, did the testator know, appreciate or understand the significance of Paragraph Nineteenth of his will providing for bequest of the residue of his estate to Lewie Williams and Marie Sharp Afflerbaugh. Although the will of September 22, 1961 was read to the decedent by Dr. Marshall Jones, there is no evidence that there was any discussion at any time between the testator and any other person relative to said Paragraph Nineteenth which would show that Guy L. Smith knew, appreciated and understood the effect of said Paragraph Nineteenth of his last will and testament and codicil.

Marshall Jones, M. D., was told by Mont Clair Spear [an associate of Lewie Williams] in advance of his witnessing the will of September 22, 1961 that Guy L. Smith was a widower without children or family. Neither Dr. Jones nor either of the other two witnesses to the will of September 22, 1961 had ever met Guy L. Smith before September 22, 1961 and none of the witnesses ever saw Mr. Smith again.

Guy L. Smith received no legal or business management advice concerning the terms, provisions and execution of his will of September 22, 1961 nor of his codicil of January 30, 1962, other than that which he received from Lewie Williams.

The rule laid down and followed by the majority, as I understand it, is that although a presumption of undue influence arises when an attorney draws a will under the terms of which he is a substantial beneficiary, if evidence

is introduced showing that the testator might logically have chosen to make the attorney such a beneficiary, the presumption disappears; and the opponents of the will must introduce other clear, cogent and convincing evidence of undue influence if they are to prevail. I will concede that such evidence was not produced here, and that if this is the proper rule, the judgment should be reversed.

But I do not think that this should be the rule in a case involving an attorney-client relationship and none of the cases cited in the majority opinion hold that it is. By drawing the will himself, instead of directing Mr. Smith to see another attorney when the desire to make him a beneficiary was expressed, the appellant made it impossible to obtain disinterested testimony concerning Mr. Smith's intent. No one knows whether that intent, assuming the will expressed it, originated in the mind of Mr. Smith or was implanted there by his attorney. There was no testimony from any witness that Mr. Smith ever expressed to anyone an intention to make his attorney the chief beneficiary of his estate or to make him a beneficiary at all. Had the will been drawn in the office of a disinterested attorney, the true state of Mr. Smith's intentions and understanding of the terms of the will could have been brought out at the trial of this case by direct testimony. In fact, this litigation probably would have been avoided altogether.

As the case now stands, this failure to advise the client to obtain the advice of another attorney appears as a suspicious circumstance. The fact that the secretary was given a legacy greater than any legacy to a natural heir is another suspicious circumstance. The fact that the appellant asked a doctor, rather than another lawyer (who might have explained its terms), to read the will to the client; the fact that a doctor who did not know the client, rather than one of several doctors who did know him, was asked to witness the will, the fact that the appellant secured the signatures of three witnesses (none of whom knew the client), rather than the two required by law,—all of these facts, while they may be consistent with an innocent purpose, are nevertheless not inconsistent with a guilty purpose.

The majority make much of the intimate friendship between the testator and his attorney. It is true that they had been friends since college days, but the record does not show a great intimacy developed until after the death of Mr. Smith's wife, which left him deeply bereaved and lonely. No provision had been made for the appellants in any previous will of the Smiths, although Williams had drawn wills which they executed in 1958 and 1960. And yet in the first will of Mr. Smith drawn after the death of his wife, which he executed in the fall of 1961, the attorney was made the principal beneficiary, and the heirs who had previously been consistently named as contingent beneficiaries were relegated to second place. Yet there was no evidence that his relations with these natural heirs had deteriorated after the death of his wife or had changed in any manner.

I mention all these factors, not as showing conclusively that the attorney unduly influenced the testator, but as showing that he may have; and I deem it extremely significant that whether such influence was exerted is a matter which is within the sole knowledge of the appellants. If such influence was exerted, it is most likely that the secretary participated or acquiesced in it. The opportunity was there; the means of proving that the exercise of such influence did occur is not available to the respondents; but the means of proving that it did not occur was readily available to the appellants at the time the will was executed and again when the codicil was executed.

In my opinion, public policy should dictate that an attorney not be permitted to take a substantial legacy under a will which he has drawn unless the testator was advised by a disinterested attorney. I do not mean this rule to apply when the attorney is merely named executor or trustee. I do not think it is necessary to resort to the legislature for the enunciation of such a policy. This court is responsible for the ethics of the legal profession, and it is its duty to police its officers and to protect the image of the profession. It may be that, to the courts, there is nothing

apparently questionable about the circumstances under which this will was drawn; but to the layman, I cannot help but imagine that they are indeed suspect.

I do not think it necessary to reiterate that the lawyer's actions in relation to his clients, as well as to the courts, should be above suspicion. Where he engages in an act which arouses a suspicion that he may have overreached his client, especially where as here, such an act could easily be avoided without any significant loss to him, the courts should not place any hint of a stamp of approval on that act.

Canon of Professional Ethics 11 provides: "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client."

I do not say that the attorney in this case violated that canon or that I even suspect that he did. But I do say that he may have done so, and that he voluntarily placed himself in a position where, although no one could prove that he did overreach his client, he could not prove that an unusual benefit bestowed on him by that client was not the result of undue influence. Because the reputation of the profession suffers when there is such an exercise of bad judgment by one of its members, he should not be allowed to profit as a result.

The classic and perhaps most often quoted statement in legal literature of the high obligations of a fiduciary is to be found in Judge Cardozo's opinion in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928):

Many forms of conduct permissible in a work a day world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of un-divided loyalty by the "disintegrating erosion" of par-ticular exceptions. (*Wendt v. Fischer,* 243 N.Y. 439, 444). Only thus has the level of conduct for fiduciaries

been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

The *Meinhard* case involved not an attorney dealing with an aged client, but a real estate investor whose conflict of interest position vis-a-vis a co-investor was under scrutiny. There can be no question that this court considers the bar in this state to be bound by the "punctilio of an honor the most sensitive"—not by the "morals of the marketplace." See *In re Lovell,* 41 Wn.2d 457, 458, 250 P.2d 109 (1952).

I realize that in my view of this case, I am assigning secondary importance to the intent of the testator and primary importance to the ethics of the profession; but I do not think that the harm done in thwarting the will of the testator in a matter of this kind is as great as the harm to be done in encouraging to any degree the kind of practice which resulted in this litigation.

Many courts have held that, where the attorney who drafted a will would receive a substantial benefit thereunder, a presumption of undue influence arises. Among the cases are *In re Lances' Estate,* 216 Cal. 397, 14 P.2d 768 (1932); *In re Romaine's Will,* 113 N.J. Eq. 477, 167 Atl. 683 (1933); (affirmed on opinion below in 115 N.J. Eq. 172, 170 Atl. 16 (1934)); *In re Erickson's Estate,* 140 Cal. App. 520, 35 P.2d 628 (1934); *In re Bartles' Will,* 127 N.J. Eq. 472, 13 A.2d 642 (1940), (modified on rehearing in 129 N.J. Eq. 280, 19 A.2d 17 (1941)); *In re Brown's Estate,* 165 Ore. 575, 108 P.2d 775 (1941); *In re Lobb's Will,* 173 Ore. 414, 145 P.2d 808 (1944).

I would go further and say that the presumption is all but irrebutable.[6] In taking this view, I frankly state that I am not relying on precedent but on my opinion, as a lawyer and judge, that a sound public policy requires that the courts should not permit their officers to profit where there is the slightest suspicion that they may have overreached

---

[6] In Canada and England, proof of independent advice is always required in the case of a gift from a client to his attorney. See footnote, p. 282, *Zvolis v. Condos,* 56 Wn.2d 275, 352 P.2d 809.

their clients, especially in a case such as this where that suspicion could so easily have been avoided.

I would affirm the trial court.

HALE, J., concurs with ROSELLINI, C. J.

---

May 19, 1966. Petition for rehearing denied.

